# APPRENDI *v.* NEW JERSEY

No. 99–478.   Argued March 28, 2000—Decided June 26, 2000

STEVENS, J., delivered the opinion of the Court, in which SCALIA, SOUTER, THOMAS, and GINSBURG, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 498. THOMAS, J., filed a concurring opinion, in which SCALIA, J., joined as to Parts I and II, *post*, p. 499. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and KENNEDY and BREYER, JJ., joined, *post*, p. 523. BREYER, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 555.

*Joseph D. O'Neill* argued the cause for petitioner. With him on the briefs were *Charles I. Coant, Richard G. Singer,* and *Jeffrey T. Green.*

*Lisa Sarnoff Gochman,* Deputy Attorney General of New Jersey, argued the cause for respondent. With her on the brief was *John J. Farmer, Jr.,* Attorney General.

*Edward C. DuMont* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson, Deputy Solicitor General Dreeben,* and *Nina Goodman.**

JUSTICE STEVENS delivered the opinion of the Court.

A New Jersey statute classifies the possession of a firearm for an unlawful purpose as a "second-degree" offense. N. J. Stat. Ann. § 2C:39–4(a) (West 1995). Such an offense is punishable by imprisonment for "between five years and 10 years." § 2C:43–6(a)(2). A separate statute, described by that State's Supreme Court as a "hate crime" law, provides for an "extended term" of imprisonment if the trial judge finds, by a preponderance of the evidence, that "[t]he de-

---

*Briefs of *amici curiae* urging reversal were filed for the National Association of Criminal Defense Lawyers et al. by *Steven B. Duke, Kyle O'Dowd, Lisa B. Kemler,* and *Peter Goldberger;* and for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden.*

Briefs of *amici curiae* urging affirmance were filed for the Anti-Defamation League by *David M. Raim, Steven M. Freeman,* and *Michael Lieberman;* and for the Brudnick Center on Violence and Conflict et al. by *Brian H. Levin.*

fendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." N. J. Stat. Ann. §2C:44–3(e) (West Supp. 1999–2000). The extended term authorized by the hate crime law for second-degree offenses is imprisonment for "between 10 and 20 years." §2C:43–7(a)(3).

The question presented is whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt.

## I

At 2:04 a.m. on December 22, 1994, petitioner Charles C. Apprendi, Jr., fired several .22-caliber bullets into the home of an African-American family that had recently moved into a previously all-white neighborhood in Vineland, New Jersey. Apprendi was promptly arrested and, at 3:05 a.m., admitted that he was the shooter. After further questioning, at 6:04 a.m., he made a statement—which he later retracted—that even though he did not know the occupants of the house personally, "because they are black in color he does not want them in the neighborhood." 159 N. J. 7, 10, 731 A. 2d 485, 486 (1999).

A New Jersey grand jury returned a 23-count indictment charging Apprendi with four first-degree, eight second-degree, six third-degree, and five fourth-degree offenses. The charges alleged shootings on four different dates, as well as the unlawful possession of various weapons. None of the counts referred to the hate crime statute, and none alleged that Apprendi acted with a racially biased purpose.

The parties entered into a plea agreement, pursuant to which Apprendi pleaded guilty to two counts (3 and 18) of second-degree possession of a firearm for an unlawful pur-

pose, N. J. Stat. Ann. § 2C:39–4a (West 1995), and one count (22) of the third-degree offense of unlawful possession of an antipersonnel bomb, § 2C:39–3a; the prosecutor dismissed the other 20 counts. Under state law, a second-degree offense carries a penalty range of 5 to 10 years, § 2C:43–6(a)(2); a third-degree offense carries a penalty range of between 3 and 5 years, § 2C:43–6(a)(3). As part of the plea agreement, however, the State reserved the right to request the court to impose a higher "enhanced" sentence on count 18 (which was based on the December 22 shooting) on the ground that that offense was committed with a biased purpose, as described in § 2C:44–3(e). Apprendi, correspondingly, reserved the right to challenge the hate crime sentence enhancement on the ground that it violates the United States Constitution.

At the plea hearing, the trial judge heard sufficient evidence to establish Apprendi's guilt on counts 3, 18, and 22; the judge then confirmed that Apprendi understood the maximum sentences that could be imposed on those counts. Because the plea agreement provided that the sentence on the sole third-degree offense (count 22) would run concurrently with the other sentences, the potential sentences on the two second-degree counts were critical. If the judge found no basis for the biased purpose enhancement, the maximum consecutive sentences on those counts would amount to 20 years in aggregate; if, however, the judge enhanced the sentence on count 18, the maximum on that count alone would be 20 years and the maximum for the two counts in aggregate would be 30 years, with a 15-year period of parole ineligibility.

After the trial judge accepted the three guilty pleas, the prosecutor filed a formal motion for an extended term. The trial judge thereafter held an evidentiary hearing on the issue of Apprendi's "purpose" for the shooting on December 22. Apprendi adduced evidence from a psychologist and from seven character witnesses who testified that he did not

have a reputation for racial bias. He also took the stand himself, explaining that the incident was an unintended consequence of overindulgence in alcohol, denying that he was in any way biased against African-Americans, and denying that his statement to the police had been accurately described. The judge, however, found the police officer's testimony credible, and concluded that the evidence supported a finding "that the crime was motivated by racial bias." App. to Pet. for Cert. 143a. Having found "by a preponderance of the evidence" that Apprendi's actions were taken "with a purpose to intimidate" as provided by the statute, *id.*, at 138a, 139a, 144a, the trial judge held that the hate crime enhancement applied. Rejecting Apprendi's constitutional challenge to the statute, the judge sentenced him to a 12-year term of imprisonment on count 18, and to shorter concurrent sentences on the other two counts.

Apprendi appealed, arguing, *inter alia,* that the Due Process Clause of the United States Constitution requires that the finding of bias upon which his hate crime sentence was based must be proved to a jury beyond a reasonable doubt, *In re Winship,* 397 U. S. 358 (1970). Over dissent, the Appellate Division of the Superior Court of New Jersey upheld the enhanced sentence. 304 N. J. Super. 147, 698 A. 2d 1265 (1997). Relying on our decision in *McMillan* v. *Pennsylvania,* 477 U. S. 79 (1986), the appeals court found that the state legislature decided to make the hate crime enhancement a "sentencing factor," rather than an element of an underlying offense—and that decision was within the State's established power to define the elements of its crimes. The hate crime statute did not create a presumption of guilt, the court determined, and did not appear " 'tailored to permit the . . . finding to be a tail which wags the dog of the substantive offense.' " 304 N. J. Super., at 154, 698 A. 2d, at 1269 (quoting *McMillan,* 477 U. S., at 88). Characterizing the required finding as one of "motive," the court described it as a traditional "sentencing factor," one not considered an "essen-

tial element" of any crime unless the legislature so provides. 304 N. J. Super., at 158, 698 A. 2d, at 1270. While recognizing that the hate crime law did expose defendants to "'greater and additional punishment,'" *id.*, at 156, 698 A. 2d, at 1269 (citing *McMillan*, 477 U. S., at 88), the court held that that "one factor standing alone" was not sufficient to render the statute unconstitutional, 304 N. J. Super., at 156, 698 A. 2d, at 1269.

A divided New Jersey Supreme Court affirmed. 159 N. J. 7, 731 A. 2d 485 (1999). The court began by explaining that while due process only requires the State to prove the "elements" of an offense beyond a reasonable doubt, the mere fact that a state legislature has placed a criminal component "within the sentencing provisions" of the criminal code "does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense." *Id.*, at 20, 731 A. 2d, at 492. "Were that the case," the court continued, "the Legislature could just as easily allow judges, not juries, to determine if a kidnapping victim has been released unharmed." *Ibid.* (citing state precedent requiring such a finding to be submitted to a jury and proved beyond a reasonable doubt). Neither could the constitutional question be settled simply by defining the hate crime statute's "purpose to intimidate" as "motive" and thereby excluding the provision from any traditional conception of an "element" of a crime. Even if one could characterize the language this way—and the court doubted that such a characterization was accurate—proof of motive did not ordinarily "increase the penal consequences to an actor." *Ibid.* Such "[l]abels," the court concluded, would not yield an answer to Apprendi's constitutional question. *Ibid.*

While noting that we had just last year expressed serious doubt concerning the constitutionality of allowing penalty-enhancing findings to be determined by a judge by a preponderance of the evidence, *Jones* v. *United States*, 526 U. S.

227 (1999), the court concluded that those doubts were not essential to our holding. Turning then, as the appeals court had, to *McMillan,* as well as to *Almendarez-Torres* v. *United States,* 523 U. S. 224 (1998), the court undertook a multifactor inquiry and then held that the hate crime provision was valid. In the majority's view, the statute did not allow impermissible burden shifting, and did not "create a separate offense calling for a separate penalty." 159 N. J., at 24, 731 A. 2d, at 494. Rather, "the Legislature simply took one factor that has always been considered by sentencing courts to bear on punishment and dictated the weight to be given that factor." *Ibid.,* 731 A. 2d, at 494–495. As had the appeals court, the majority recognized that the state statute was unlike that in *McMillan* inasmuch as it increased the maximum penalty to which a defendant could be subject. But it was not clear that this difference alone would "change the constitutional calculus," especially where, as here, "there is rarely any doubt whether the defendants committed the crimes with the purpose of intimidating the victim on the basis of race or ethnicity." 159 N. J., at 24–25, 731 A. 2d, at 495. Moreover, in light of concerns "idiosyncratic" to hate crime statutes drawn carefully to avoid "punishing thought itself," the enhancement served as an appropriate balance between those concerns and the State's compelling interest in vindicating the right "to be free of invidious discrimination." *Id.,* at 25–26, 731 A. 2d, at 495.

The dissent rejected this conclusion, believing instead that the case turned on two critical characteristics: (1) "[A] defendant's mental state in committing the subject offense . . . necessarily involves a finding so integral to the charged offense that it must be characterized as an element thereof"; and (2) "the significantly increased sentencing range triggered by . . . the finding of a purpose to intimidate" means that the purpose "must be treated as a material element [that] must be found by a jury beyond a reasonable doubt."

*Id.*, at 30, 731 A. 2d, at 498. In the dissent's view, the facts increasing sentences in both *Almendarez-Torres* (recidivism) and *Jones* (serious bodily injury) were quite distinct from New Jersey's required finding of purpose here; the latter finding turns directly on the conduct of the defendant during the crime and defines a level of culpability necessary to form the hate crime offense. While acknowledging "analytical tensions" in this Court's post-*Winship* jurisprudence, the dissenters concluded that "there can be little doubt that the sentencing factor applied to this defendant—the purpose to intimidate a victim because of race—must fairly be regarded as an element of the crime requiring inclusion in the indictment and proof beyond a reasonable doubt." 159 N. J., at 51, 731 A. 2d, at 512.

We granted certiorari, 528 U. S. 1018 (1999), and now reverse.

## II

It is appropriate to begin by explaining why certain aspects of the case are not relevant to the narrow issue that we must resolve. First, the State has argued that even without the trial judge's finding of racial bias, the judge could have imposed consecutive sentences on counts 3 and 18 that would have produced the 12-year term of imprisonment that Apprendi received; Apprendi's actual sentence was thus within the range authorized by statute for the three offenses to which he pleaded guilty. Brief for Respondent 4. The constitutional question, however, is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum for the offense charged in that count. The finding is legally significant because it increased—indeed, it doubled—the maximum range within which the judge could exercise his discretion, converting what otherwise was a maximum 10-year sentence on that count into a minimum sentence. The sentences on counts 3 and 22 have no more relevance to our disposition than the dismissal of the remaining 18 counts.

Second, although the constitutionality of basing an enhanced sentence on racial bias was argued in the New Jersey courts, that issue was not raised here.[1] The substantive basis for New Jersey's enhancement is thus not at issue; the adequacy of New Jersey's procedure is. The strength of the state interests that are served by the hate crime legislation has no more bearing on this procedural question than the strength of the interests served by other provisions of the criminal code.

Third, we reject the suggestion by the State Supreme Court that "there is rarely any doubt" concerning the existence of the biased purpose that will support an enhanced sentence, 159 N. J., at 25, 731 A. 2d, at 495. In this very case, that issue was the subject of the full evidentiary hearing we described. We assume that both the purpose of the offender, and even the known identity of the victim, will sometimes be hotly disputed, and that the outcome may well depend in some cases on the standard of proof and the identity of the factfinder.

Fourth, because there is no ambiguity in New Jersey's statutory scheme, this case does not raise any question concerning the State's power to manipulate the prosecutor's burden of proof by, for example, relying on a presumption rather than evidence to establish an element of an offense, cf. *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975); *Sandstrom* v. *Montana*, 442 U. S. 510 (1979), or by placing the affirmative defense label on "at least some elements" of traditional crimes, *Patterson* v. *New York*, 432 U. S. 197, 210 (1977). The prosecutor did not invoke any presumption to buttress the evidence of racial bias and did not claim that Apprendi had the burden of disproving an improper motive. The question whether Apprendi had a constitutional right to

---

[1] We have previously rejected a First Amendment challenge to an enhanced sentence based on a jury finding that the defendant had intentionally selected his victim because of the victim's race. *Wisconsin* v. *Mitchell*, 508 U. S. 476, 480 (1993).

have a jury find such bias on the basis of proof beyond a reasonable doubt is starkly presented.

Our answer to that question was foreshadowed by our opinion in *Jones* v. *United States*, 526 U. S. 227 (1999), construing a federal statute. We there noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.*, at 243, n. 6. The Fourteenth Amendment commands the same answer in this case involving a state statute.

## III

In his 1881 lecture on the criminal law, Oliver Wendell Holmes, Jr., observed: "The law threatens certain pains if you do certain things, intending thereby to give you a new motive for not doing them. If you persist in doing them, it has to inflict the pains in order that its threats may continue to be believed."[2] New Jersey threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race. As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect Apprendi from unwarranted pains should apply equally to the two acts that New Jersey has singled out for punishment. Merely using the label "sentence enhancement" to describe the latter surely does not provide a principled basis for treating them differently.

At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an im-

---

[2] O. Holmes, The Common Law 40 (M. Howe ed. 1963).

partial jury," Amdt. 6.[3]  Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."  *United States* v. *Gaudin,* 515 U. S. 506, 510 (1995); see also *Sullivan* v. *Louisiana,* 508 U. S. 275, 278 (1993); *Winship,* 397 U. S., at 364 ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

As we have, unanimously, explained, *Gaudin,* 515 U. S., at 510–511, the historical foundation for our recognition of these principles extends down centuries into the common law.  "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540–541 (4th ed. 1873), trial by jury has been understood to require that "*the truth of every accusation,* whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . ."  4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone) (emphasis added).  See also *Duncan* v. *Louisiana,* 391 U. S. 145, 151–154 (1968).

---

[3] Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment.  He relies entirely on the fact that the "due process of law" that the Fourteenth Amendment requires the States to provide to persons accused of crime encompasses the right to a trial by jury, *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and the right to have every element of the offense proved beyond a reasonable doubt, *In re Winship,* 397 U. S. 358 (1970).  That Amendment has not, however, been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury" that was implicated in our recent decision in *Almendarez-Torres* v. *United States,* 523 U. S. 224 (1998).  We thus do not address the indictment question separately today.

Equally well founded is the companion right to have the jury verdict based on proof beyond a reasonable doubt. "The 'demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula "beyond a reasonable doubt" seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt.' C. McCormick, Evidence § 321, pp. 681–682 (1954); see also 9 J. Wigmore, Evidence § 2497 (3d ed. 1940)." *Winship*, 397 U. S., at 361. We went on to explain that the reliance on the "reasonable doubt" standard among common-law jurisdictions " 'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.' " *Id.*, at 361–362 (quoting *Duncan*, 391 U. S., at 155).

Any possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by court[4] as it existed during the years surrounding our Nation's founding. As a general rule, criminal proceedings were submitted to a jury after being initiated by an indictment containing "all the facts and circumstances which constitute the offence, . . . stated with such certainty and precision, that the defendant . . . may be enabled to determine the species of offence they constitute, in order that he may prepare his defence accordingly . . . and *that there may be no doubt as to the judgment which should be given*, if the defendant be convicted." J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862) (emphasis added). The defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from the invariable linkage of punishment with crime. See 4 Black-

---

[4] "[A]fter trial and conviction are past," the defendant is submitted to "judgment" by the court, 4 Blackstone 368—the stage approximating in modern terms the imposition of sentence.

stone 369–370 (after verdict, and barring a defect in the indictment, pardon, or benefit of clergy, "the court *must pronounce that judgment, which the law hath annexed to the crime*" (emphasis added)).

Thus, with respect to the criminal law of felonious conduct, "the English trial judge of the later eighteenth century had very little explicit discretion in sentencing. The substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense. The judge was meant simply to impose that sentence (unless he thought in the circumstances that the sentence was so inappropriate that he should invoke the pardon process to commute it)." Langbein, The English Criminal Trial Jury on the Eve of the French Revolution, in The Trial Jury in England, France, Germany 1700–1900, pp. 36–37 (A. Schioppa ed. 1987).[5] As Blackstone, among many others, has made clear,[6] "[t]he judg-

---

[5] As we suggested in *Jones* v. *United States*, 526 U. S. 227 (1999), juries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant. *Id.*, at 245 ("This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses, manifestations of what Blackstone described as 'pious perjury' on the jurors' part. 4 Blackstone 238–239").

[6] As the principal dissent would chide us for this single citation to Blackstone's third volume, rather than his fourth, *post*, at 525–526 (opinion of O'CONNOR, J.), we suggest that Blackstone himself directs us to it for these purposes. See 4 Blackstone 343 ("The antiquity and excellence of this [jury] trial, for the settling of civil property, has before been explained at large"). See 3 *id.*, at 379 ("Upon these accounts the trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law. And, if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened, when it is applied to criminal cases!"); 4 *id.*, at 343 ("And it will hold much stronger in criminal cases; since, in times of difficulty and danger, more is to be apprehended from the violence and partiality of judges appointed by the crown, in suits between the king and the subject, than in disputes between one individual and another, to settle the metes and boundaries of private property");

ment, though pronounced or awarded by the judges, is not their determination or sentence, but the determination and sentence of the law." 3 Blackstone 396 (emphasis deleted).[7]

This practice at common law held true when indictments were issued pursuant to statute. Just as the circumstances of the crime and the intent of the defendant at the time of commission were often essential elements to be alleged in the indictment, so too were the circumstances mandating a particular punishment. "Where a statute annexes a higher degree of punishment to a common-law felony, if committed under particular circumstances, an indictment for the offence, in order to bring the defendant within that higher degree of punishment, must expressly charge it to have been committed under those circumstances, and must state the circumstances with certainty and precision. [2 M. Hale, Pleas of the Crown *170]." Archbold, Pleading and Evidence in Criminal Cases, at 51. If, then, "upon an indictment under the statute, the prosecutor prove the felony to have been committed, but fail in proving it to have been committed under the circumstances specified in the statute, the

---

4 *id.*, at 344 ("What was said of juries in general, and the trial thereby, in *civil* cases, will greatly shorten our present remarks, with regard to the trial of *criminal* suits; indictments, informations, and appeals").

[7] The common law of punishment for misdemeanors—those "smaller faults, and omissions of less consequence," 4 *id.*, at 5—was, as we noted in *Jones*, 526 U. S., at 244, substantially more dependent upon judicial discretion. Subject to the limitations that the punishment not "touch life or limb," that it be proportionate to the offense, and, by the 17th century, that it not be "cruel or unusual," judges most commonly imposed discretionary "sentences" of fines or whippings upon misdemeanants. J. Baker, Introduction to English Legal History 584 (3d ed. 1990). Actual sentences of imprisonment for such offenses, however, were rare at common law until the late 18th century, *ibid.*, for "the idea of prison as a punishment would have seemed an absurd expense," Baker, Criminal Courts and Procedure at Common Law 1550–1800, in Crime in England 1550–1800, p. 43 (J. Cockburn ed. 1977).

defendant shall be convicted of the common-law felony only."
*Id.*, at 188.[8]

We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case. See, *e. g., Williams* v. *New York,* 337 U. S. 241, 246 (1949) ("[B]oth before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed *within limits fixed by law*" (emphasis added)). As in *Williams,* our periodic recognition of judges' broad discretion in sentencing—since the 19th-century shift in this country from statutes providing fixed-term sentences to those providing judges discretion within a permissible range, Note, The Admissibility of Character Evidence in Determining Sentence, 9 U. Chi. L. Rev. 715 (1942)—has been regularly accompanied by the qualification that that discretion was bound by the range of sentencing options prescribed by the legislature. See, *e. g., United States* v. *Tucker,* 404 U. S. 443, 447 (1972) (agreeing that "[t]he Government is also on solid ground in asserting that a

---

[8] To the extent the principal dissent appears to take issue with our reliance on Archbold (among others) as an authoritative source on the common law of the relevant period, *post,* at 525, 526, we simply note that Archbold has been cited by numerous opinions of this Court for that very purpose, his Criminal Pleading treatise being generally viewed as "an essential reference book for every criminal lawyer working in the Crown Court." Biographical Dictionary of the Common Law 13 (A. Simpson ed. 1984); see also Holdsworth, The Literature of the Common Law, in 13 A History of English Law 464–465 (A. Goodhart & H. Hanbury eds. 1952).

sentence imposed by a federal district judge, *if within statutory limits,* is generally not subject to review" (emphasis added)); *Williams,* 337 U. S., at 246, 247 (explaining that, in contrast to the guilt stage of trial, the judge's task in sentencing is to determine, "within fixed statutory or constitutional limits[,] the type and extent of punishment after the issue of guilt" has been resolved).[9]

The historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties provided highlight the novelty of a legislative scheme that removes the jury from

---

[9] See also 1 J. Bishop, Criminal Law §§ 933–934(1) (9th ed. 1923) ("With us legislation ordinarily fixes the penalties for the common law offences equally with the statutory ones. . . . Under the common-law procedure, the court determines in each case what *within the limits of the law* shall be the punishment,—the question being one of discretion" (emphasis added)); *id.,* § 948 ("[I]f the law has given the court a discretion as to the punishment, it will look in pronouncing sentence into any evidence proper to influence a judicious magistrate to make it heavier or lighter, yet not to exceed the limits fixed for what of crime is within the allegation and the verdict. Or this sort of evidence may be placed before the jury at the trial, if it has the power to assess the punishment. But in such a case the aggravating matter must not be of a crime separate from the one charged in the indictment,—a rule not applicable where a delinquent offence under an habitual criminal act is involved" (footnotes omitted)).

The principal dissent's discussion of *Williams, post,* at 545–546, 547, fails to acknowledge the significance of the Court's caveat that judges' discretion is constrained by the "limits fixed by law." Nothing in *Williams* implies that a judge may impose a more severe sentence than the maximum authorized by the facts found by the jury. Indeed, the commentators cited in the dissent recognize precisely this same limitation. See *post,* at 544–545 (quoting K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998) ("From the beginning of the Republic, federal judges were entrusted with wide sentencing discretion . . . , permitting the sentencing judge to impose any term of imprisonment and any fine *up to the statutory maximum*" (emphasis added)); Lynch, Towards A Model Penal Code, Second (Federal?), 2 Buffalo Crim. L. Rev. 297, 320 (1998) (noting that judges in discretionary sentencing took account of facts relevant to a particular offense "within the spectrum of conduct covered by the statute of conviction")).

the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.[10]

We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears "that the jury right could be lost not only by gross denial, but by erosion." *Jones*, 526 U. S., at 247–248.[11] But practice must at least adhere to the basic principles undergirding the requirements of trying to a jury all facts necessary to constitute a statutory offense, and proving those facts beyond reason-

---

[10] In support of its novel view that this Court has "long recognized" that not all facts affecting punishment need go to the jury, *post*, at 524, the principal dissent cites three cases decided within the past quarter century; and each of these is plainly distinguishable. Rather than offer any historical account of its own that would support the notion of a "sentencing factor" legally increasing punishment beyond the statutory maximum—and JUSTICE THOMAS' concurring opinion in this case makes clear that such an exercise would be futile—the dissent proceeds by mischaracterizing our account. The evidence we describe that punishment was, by law, tied to the offense (enabling the defendant to discern, barring pardon or clergy, his punishment from the face of the indictment), and the evidence that American judges have exercised sentencing discretion within a legally prescribed range (enabling the defendant to discern from the statute of indictment what maximum punishment conviction under that statute could bring), point to a single, consistent conclusion: The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition "elements" of a separate legal offense.

[11] As we stated in *Jones:* "One contributor to the ratification debates, for example, commenting on the jury trial guarantee in Art. III, §2, echoed Blackstone in warning of the need 'to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY.' A [New Hampshire] Farmer, No. 3, June 6, 1788, quoted in The Complete Bill of Rights 477 (N. Cogan ed. 1997)." 526 U. S., at 248.

able doubt. As we made clear in *Winship*, the "reasonable doubt" requirement "has [a] vital role in our criminal procedure for cogent reasons." 397 U. S., at 363. Prosecution subjects the criminal defendant both to "the possibility that he may lose his liberty upon conviction and . . . the certainty that he would be stigmatized by the conviction." *Ibid.* We thus require this, among other, procedural protections in order to "provid[e] concrete substance for the presumption of innocence," and to reduce the risk of imposing such deprivations erroneously. *Ibid.* If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached.

Since *Winship*, we have made clear beyond peradventure that *Winship's* due process and associated jury protections extend, to some degree, "to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence." *Almendarez-Torres*, 523 U. S., at 251 (SCALIA, J., dissenting). This was a primary lesson of *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975), in which we invalidated a Maine statute that presumed that a defendant who acted with an intent to kill possessed the "malice aforethought" necessary to constitute the State's murder offense (and therefore, was subject to that crime's associated punishment of life imprisonment). The statute placed the burden on the defendant of proving, in rebutting the statutory presumption, that he acted with a lesser degree of culpability, such as in the heat of passion, to win a reduction in the offense from murder to manslaughter (and thus a reduction of the maximum punishment of 20 years).

The State had posited in *Mullaney* that requiring a defendant to prove heat-of-passion intent to overcome a pre-

sumption of murderous intent did not implicate *Winship* protections because, upon conviction of either offense, the defendant would lose his liberty and face societal stigma just the same. Rejecting this argument, we acknowledged that criminal law "is concerned not only with guilt or innocence in the abstract, but also with the degree of criminal culpability" assessed. 421 U. S., at 697–698. Because the *"consequences"* of a guilty verdict for murder and for manslaughter differed substantially, we dismissed the possibility that a State could circumvent the protections of *Winship* merely by "redefin[ing] the elements that constitute different crimes, characterizing them as factors that bear solely on the extent of punishment." 421 U. S., at 698.[12]

## IV

It was in *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), that this Court, for the first time, coined the term "sentencing factor" to refer to a fact that was not found by a jury but that could affect the sentence imposed by the judge. That case involved a challenge to the State's Man-

---

[12] Contrary to the principal dissent's suggestion, *post*, at 530–532, *Patterson* v. *New York*, 432 U. S. 197, 198 (1977), posed no direct challenge to this aspect of *Mullaney*. In upholding a New York law allowing defendants to raise and prove extreme emotional distress as an affirmative defense to murder, *Patterson* made clear that the state law still required the State to prove every element of that State's offense of murder and its accompanying punishment. "No further facts are either presumed or inferred in order to constitute the crime." 432 U. S., at 205–206. New York, unlike Maine, had not made malice aforethought, or any described *mens rea*, part of its statutory definition of second-degree murder; one could tell from the face of the statute that if one intended to cause the death of another person and did cause that death, one could be subject to sentence for a second-degree offense. *Id.*, at 198. Responding to the argument that our view could be seen "to permit state legislatures to reallocate burdens of proof by labeling as affirmative defenses at least some elements of the crimes now defined in their statutes," the Court made clear in the very next breath that there were "obviously constitutional limits beyond which the States may not go in this regard." *Id.*, at 210.

datory Minimum Sentencing Act, 42 Pa. Cons. Stat. § 9712 (1982). According to its provisions, anyone convicted of certain felonies would be subject to a mandatory minimum penalty of five years' imprisonment if the judge found, by a preponderance of the evidence, that the person "visibly possessed a firearm" in the course of committing one of the specified felonies. 477 U. S., at 81–82. Articulating for the first time, and then applying, a multifactor set of criteria for determining whether the *Winship* protections applied to bar such a system, we concluded that the Pennsylvania statute did not run afoul of our previous admonitions against relieving the State of its burden of proving guilt, or tailoring the mere form of a criminal statute solely to avoid *Winship*'s strictures. 477 U. S., at 86–88.

We did not, however, there budge from the position that (1) constitutional limits exist to States' authority to define away facts necessary to constitute a criminal offense, *id.*, at 85–88, and (2) that a state scheme that keeps from the jury facts that "expos[e] [defendants] to greater or additional punishment," *id.*, at 88, may raise serious constitutional concern. As we explained:

> "Section 9712 neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm. . . . The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense. Petitioners' claim that visible possession under the Pennsylvania statute is 'really' an element of the offenses for which they are being punished—that Pennsylvania has in effect defined a new set of upgraded felonies—would have at least more superficial appeal if a finding of visible possession exposed them to greater or additional punish-

ment, cf. 18 U. S. C. § 2113(d) (providing separate and greater punishment for bank robberies accomplished through 'use of a dangerous weapon or device'), but it does not." *Id.*, at 87–88.[13]

Finally, as we made plain in *Jones* last Term, *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998), represents at best an exceptional departure from the historic practice that we have described. In that case, we considered a federal grand jury indictment, which charged the petitioner with "having been 'found in the United States . . . after being deported,'" in violation of 8 U. S. C. § 1326(a)—an offense carrying a maximum sentence of two years. 523 U. S., at 227. Almendarez-Torres pleaded guilty to the indictment, admitting at the plea hearing that he had been deported, that he had unlawfully reentered this country, and that "the earlier deportation had taken place 'pursuant to' three earlier 'convictions' for aggravated felonies." *Ibid.* The Government then filed a presentence report indicating that Almendarez-Torres' offense fell within the bounds of § 1326(b) because, as specified in that provision, his original deportation had been subsequent to an aggravated felony conviction; accordingly, Almendarez-Torres could be subject to a sentence of up to 20 years. Almendarez-Torres objected, contending that because the indictment "had not mentioned his earlier aggravated felony convictions," he could be sentenced to no more than two years in prison. *Ibid.*

---

[13] The principal dissent accuses us of today "overruling *McMillan*." *Post*, at 533. We do not overrule *McMillan*. We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself. Conscious of the likelihood that legislative decisions may have been made in reliance on *McMillan*, we reserve for another day the question whether *stare decisis* considerations preclude reconsideration of its narrower holding.

Rejecting Almendarez-Torres' objection, we concluded that sentencing him to a term higher than that attached to the offense alleged in the indictment did not violate the strictures of *Winship* in that case. Because Almendarez-Torres had *admitted* the three earlier convictions for aggravated felonies—all of which had been entered pursuant to proceedings with substantial procedural safeguards of their own—no question concerning the right to a jury trial or the standard of proof that would apply to a contested issue of fact was before the Court. Although our conclusion in that case was based in part on our application of the criteria we had invoked in *McMillan*, the specific question decided concerned the sufficiency of the indictment. More important, as *Jones* made crystal clear, 526 U. S., at 248–249, our conclusion in *Almendarez-Torres* turned heavily upon the fact that the additional sentence to which the defendant was subject was "the prior commission of a serious crime." 523 U. S., at 230; see also *id.*, at 243 (explaining that "recidivism . . . is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"); *id.*, at 244 (emphasizing "the fact that recidivism 'does not relate to the commission of the offense . . .'"); *Jones*, 526 U. S., at 249–250, n. 10 ("The majority and the dissenters in *Almendarez-Torres* disagreed over the legitimacy of the Court's decision to restrict its holding to recidivism, but both sides agreed that the Court had done just that"). Both the certainty that procedural safeguards attached to any "fact" of prior conviction, and the reality that Almendarez-Torres did not challenge the accuracy of that "fact" in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a "fact" increasing punishment beyond the maximum of the statutory range.[14]

---

[14] The principal dissent's contention that our decision in *Monge* v. *California*, 524 U. S. 721 (1998), "demonstrates that *Almendarez-Torres* was" something other than a limited exception to the jury trial rule is both

Even though it is arguable that *Almendarez-Torres* was incorrectly decided,[15] and that a logical application of our reasoning today should apply if the recidivist issue were

---

inaccurate and misleading. *Post*, at 536. *Monge* was another recidivism case in which the question presented and the bulk of the Court's analysis related to the scope of double jeopardy protections in sentencing. The dissent extracts from that decision the majority's statement that "the Court has rejected an absolute rule that an enhancement constitutes an element of the offense any time that it increases the maximum sentence." 524 U. S., at 729. Far from being part of "reasoning essential" to the Court's holding, *post*, at 536, that statement was in response to a dissent by JUSTICE SCALIA on an issue that the Court itself had, a few sentences earlier, insisted "was neither considered by the state courts nor discussed in petitioner's brief before this Court." 524 U. S., at 728. Moreover, the sole citation supporting the *Monge* Court's proposition that "the Court has rejected" such a rule was none other than *Almendarez-Torres;* as we have explained, that case simply cannot bear that broad reading. Most telling of *Monge's* distance from the issue at stake in this case is that the double jeopardy question in *Monge* arose because the State had failed to satisfy its own statutory burden of proving beyond a reasonable doubt that the defendant had committed a prior offense (and was therefore subject to an enhanced, recidivism-based sentence). 524 U. S., at 725 ("According to California law, a number of procedural safeguards surround the assessment of prior conviction allegations: Defendants may invoke the right to a jury trial . . . ; the prosecution must prove the allegations beyond a reasonable doubt; and the rules of evidence apply"). The Court thus itself warned against a contrary double jeopardy rule that could "create disincentives that would diminish these important procedural protections." *Id.*, at 734.

[15] In addition to the reasons set forth in JUSTICE SCALIA's dissent, 523 U. S., at 248–260, it is noteworthy that the Court's extensive discussion of the term "sentencing factor" virtually ignored the pedigree of the pleading requirement at issue. The rule was succinctly stated by Justice Clifford in his separate opinion in *United States* v. *Reese*, 92 U. S. 214, 232–233 (1876): "[T]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." As he explained in "[s]peaking of that principle, Mr. Bishop says it pervades the entire system of the adjudged law of criminal procedure, as appears by all the cases; that, wherever we move in that department of our jurisprudence, we come in contact with it; and that we can no more escape from it than from

contested, Apprendi does not contest the decision's validity and we need not revisit it for purposes of our decision today to treat the case as a narrow exception to the general rule we recalled at the outset. Given its unique facts, it surely does not warrant rejection of the otherwise uniform course of decision during the entire history of our jurisprudence.

In sum, our reexamination of our cases in this area, and of the history upon which they rely, confirms the opinion that we expressed in *Jones.* Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in that case: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." 526 U. S., at 252–253 (opinion of STEVENS, J.); see also *id.,* at 253 (opinion of SCALIA, J.).[16]

---

the atmosphere which surrounds us. 1 Bishop, Cr. Pro., 2d ed., sect. 81; Archbold's Crim. Plead., 15th ed., 54; 1 Stark Crim. Plead., 236; 1 Am. Cr. Law, 6th rev. ed., sect. 364; *Steel* v. *Smith,* 1 Barn. & Ald. 99."

[16] The principal dissent would reject the Court's rule as a "meaningless formalism," because it can conceive of hypothetical statutes that would comply with the rule and achieve the same result as the New Jersey statute. *Post,* at 539–542. While a State could, hypothetically, undertake to revise its entire criminal code in the manner the dissent suggests, *post,* at 540—extending all statutory maximum sentences to, for example, 50 years and giving judges guided discretion as to a few specially selected factors within that range—this possibility seems remote. Among other reasons, structural democratic constraints exist to discourage legislatures from enacting penal statutes that expose *every* defendant convicted of, for example, weapons possession, to a maximum sentence exceeding that which is, in the legislature's judgment, generally proportional to the crime. This is as it should be. Our rule ensures that a State is obliged "to make its choices concerning the substantive content of its criminal laws with full awareness of the consequences, unable to mask substantive policy choices"

## V

The New Jersey statutory scheme that Apprendi asks us to invalidate allows a jury to convict a defendant of a second-degree offense based on its finding beyond a reasonable doubt that he unlawfully possessed a prohibited weapon; after a subsequent and separate proceeding, it then allows a judge to impose punishment identical to that New Jersey provides for crimes of the first degree, N. J. Stat. Ann. § 2C:43-6(a)(1) (West 1999), based upon the judge's finding, by a preponderance of the evidence, that the defendant's "purpose" for unlawfully possessing the weapon was "to intimidate" his victim on the basis of a particular characteristic the victim possessed. In light of the constitutional rule ex-

---

of exposing all who are convicted to the maximum sentence it provides. *Patterson* v. *New York*, 432 U. S., at 228–229, n. 13 (Powell, J., dissenting). So exposed, "[t]he political check on potentially harsh legislative action is then more likely to operate." *Ibid.*

In all events, if such an extensive revision of the State's entire criminal code were enacted for the purpose the dissent suggests, or if New Jersey simply reversed the burden of the hate crime finding (effectively assuming a crime was performed with a purpose to intimidate and then requiring a defendant to prove that it was not, *post*, at 542), we would be required to question whether the revision was constitutional under this Court's prior decisions. See *Patterson*, 432 U. S., at 210; *Mullaney* v. *Wilbur*, 421 U. S. 684, 698–702 (1975).

Finally, the principal dissent ignores the distinction the Court has often recognized, see, *e. g.*, *Martin* v. *Ohio*, 480 U. S. 228 (1987), between facts in aggravation of punishment and facts in mitigation. See *post*, at 541–542. If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme.

plained above, and all of the cases supporting it, this practice cannot stand.

New Jersey's defense of its hate crime enhancement statute has three primary components: (1) The required finding of biased purpose is not an "element" of a distinct hate crime offense, but rather the traditional "sentencing factor" of motive; (2) *McMillan* holds that the legislature can authorize a judge to find a traditional sentencing factor on the basis of a preponderance of the evidence; and (3) *Almendarez-Torres* extended *McMillan's* holding to encompass factors that authorize a judge to impose a sentence beyond the maximum provided by the substantive statute under which a defendant is charged. None of these persuades us that the constitutional rule that emerges from our history and case law should incorporate an exception for this New Jersey statute.

New Jersey's first point is nothing more than a disagreement with the rule we apply today. Beyond this, we do not see how the argument can succeed on its own terms. The state high court evinced substantial skepticism at the suggestion that the hate crime statute's "purpose to intimidate" was simply an inquiry into "motive." We share that skepticism. The text of the statute requires the factfinder to determine whether the defendant possessed, at the time he committed the subject act, a "purpose to intimidate" on account of, *inter alia,* race. By its very terms, this statute mandates an examination of the defendant's state of mind—a concept known well to the criminal law as the defendant's *mens rea.*[17] It makes no difference in identifying the nature

---

[17] Among the most common definitions of *mens rea* is "criminal intent." Black's Law Dictionary 1137 (rev. 4th ed. 1968). That dictionary unsurprisingly defines "purpose" as synonymous with intent, *id.,* at 1400, and "intent" as, among other things, "a state of mind," *id.,* at 947. But we need not venture beyond New Jersey's own criminal code for a definition of purpose that makes it central to the description of a criminal offense. As the dissenting judge on the state appeals court pointed out, according to the New Jersey Criminal Code, "[a] person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object

of this finding that Apprendi was also required, in order to receive the sentence he did for weapons possession, to have possessed the weapon with a "purpose to use [the weapon] unlawfully against the person or property of another," § 2C:39–4(a). A second *mens rea* requirement hardly defeats the reality that the enhancement statute imposes of its own force an intent requirement necessary for the imposition of sentence. On the contrary, the fact that the language and structure of the "purpose to use" criminal offense is identical in relevant respects to the language and structure of the "purpose to intimidate" provision demonstrates to us that it is precisely a particular criminal *mens rea* that the hate crime enhancement statute seeks to target. The defendant's intent in committing a crime is perhaps as close as one might hope to come to a core criminal offense "element."[18]

---

to engage in conduct of that nature or to cause such a result." N. J. Stat. Ann. § 2C:2–2(b)(1) (West 1999). The hate crime statute's application to those who act "with a *purpose to intimidate* because of" certain status-based characteristics places it squarely within the inquiry whether it was a defendant's "conscious object" to intimidate for that reason.

[18] Whatever the effect of the State Supreme Court's comment that the law here targets "motive," 159 N. J. 7, 20, 731 A. 2d 485, 492 (1999)—and it is highly doubtful that one could characterize that comment as a "binding" interpretation of the state statute, see *Wisconsin* v. *Mitchell,* 508 U. S., at 483–484 (declining to be bound by state court's characterization of state law's "operative effect"), even if the court had not immediately thereafter called into direct question its "ability to view this finding as merely a search for motive," 159 N. J., at 21, 731 A. 2d, at 492—a State cannot through mere characterization change the nature of the conduct actually targeted. It is as clear as day that this hate crime law defines a particular kind of prohibited *intent,* and a particular intent is more often than not the *sine qua non* of a violation of a criminal law.

When the principal dissent at long last confronts the actual statute at issue in this case in the final few pages of its opinion, it offers in response to this interpretation only that our reading is contrary to "settled precedent" in *Mitchell. Post,* at 553. Setting aside the fact that Wisconsin's hate crime statute was, in text and substance, different from New Jersey's, *Mitchell* did not even begin to consider whether the Wisconsin hate crime

The foregoing notwithstanding, however, the New Jersey Supreme Court correctly recognized that it does not matter whether the required finding is characterized as one of intent or of motive, because "[l]abels do not afford an acceptable answer." 159 N. J., at 20, 731 A. 2d, at 492. That point applies as well to the constitutionally novel and elusive distinction between "elements" and "sentencing factors." McMillan, 477 U. S., at 86 (noting that the sentencing factor—visible possession of a firearm—"might well have been included as an element of the enumerated offenses"). Despite what appears to us the clear "elemental" nature of the factor here, the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict? [19]

As the New Jersey Supreme Court itself understood in rejecting the argument that the required "motive" finding was simply a "traditional" sentencing factor, proof of motive did not ordinarily "increase the penal consequences to an actor." 159 N. J., at 20, 731 A. 2d, at 492. Indeed, the effect of New Jersey's sentencing "enhancement" here is unquestionably to turn a second-degree offense into a first-degree offense, under the State's own criminal code. The law thus runs directly into our warning in Mullaney that Winship is

---

requirement was an offense "element" or not; it did not have to—the required finding under the Wisconsin statute was made by the jury.

[19] This is not to suggest that the term "sentencing factor" is devoid of meaning. The term appropriately describes a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence within the range authorized by the jury's finding that the defendant is guilty of a particular offense. On the other hand, when the term "sentence enhancement" is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an "element" of the offense. See post, at 501–502 (THOMAS, J., concurring) (reviewing the relevant authorities).

concerned as much with the category of substantive offense as "with the degree of criminal culpability" assessed. 421 U. S., at 698. This concern flows not only from the historical pedigree of the jury and burden rights, but also from the powerful interests those rights serve. The degree of criminal culpability the legislature chooses to associate with particular, factually distinct conduct has significant implications both for a defendant's very liberty, and for the heightened stigma associated with an offense the legislature has selected as worthy of greater punishment.

The preceding discussion should make clear why the State's reliance on *McMillan* is likewise misplaced. The differential in sentence between what Apprendi would have received without the finding of biased purpose and what he could receive with it is not, it is true, as extreme as the difference between a small fine and mandatory life imprisonment. *Mullaney*, 421 U. S., at 700. But it can hardly be said that the potential doubling of one's sentence—from 10 years to 20—has no more than a nominal effect. Both in terms of absolute years behind bars, and because of the more severe stigma attached, the differential here is unquestionably of constitutional significance. When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as "a tail which wags the dog of the substantive offense." *McMillan*, 477 U. S., at 88.

New Jersey would also point to the fact that the State did not, in placing the required biased purpose finding in a sentencing enhancement provision, create a "separate offense calling for a separate penalty." *Ibid.* As for this, we agree wholeheartedly with the New Jersey Supreme Court that merely because the state legislature placed its hate crime sentence "enhancer" "within the sentencing provisions" of the criminal code "does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense." 159 N. J., at 20, 731 A. 2d, at 492. Indeed,

the fact that New Jersey, along with numerous other States, has also made precisely the same conduct the subject of an independent substantive offense makes it clear that the mere presence of this "enhancement" in a sentencing statute does not define its character.[20]

New Jersey's reliance on *Almendarez-Torres* is also unavailing. The reasons supporting an exception from the general rule for the statute construed in that case do not apply to the New Jersey statute. Whereas recidivism "does not relate to the commission of the offense" itself, 523 U. S., at 230, 244, New Jersey's biased purpose inquiry goes precisely to what happened in the "commission of the offense." Moreover, there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.

Finally, this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. *Walton* v. *Arizona*, 497 U. S. 639, 647–649 (1990); *id.*, at 709–714 (STEVENS, J., dissenting). For reasons we have explained, the capital cases are not controlling:

---

[20] Including New Jersey, N. J. Stat. Ann. §2C:33–4 (West Supp. 2000) ("A person commits a crime of the fourth degree if in committing an offense [of harassment] under this section, he acted with a purpose to intimidate an individual or group of individuals because of race, color, religion, gender, handicap, sexual orientation or ethnicity"), 26 States currently have laws making certain acts of racial or other bias freestanding violations of the criminal law, see generally F. Lawrence, Punishing Hate: Bias Crimes Under American Law 178–189 (1999) (listing current state hate crime laws).

"Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed .... The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge." *Almendarez-Torres*, 523 U. S., at 257, n. 2 (SCALIA, J., dissenting) (emphasis deleted).

See also *Jones*, 526 U. S., at 250–251; *post*, at 520–522 (THOMAS, J., concurring).[21]

\* \* \*

The New Jersey procedure challenged in this case is an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system. Accordingly, the judgment of the Supreme Court of New Jersey is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[21] The principal dissent, in addition, treats us to a lengthy disquisition on the benefits of determinate sentencing schemes, and the effect of today's decision on the federal Sentencing Guidelines. *Post*, at 544–552. The Guidelines are, of course, not before the Court. We therefore express no view on the subject beyond what this Court has already held. See, · *e. g.*, *Edwards* v. *United States*, 523 U. S. 511, 515 (1998) (opinion of BREYER, J., for a unanimous court) (noting that "[o]f course, petitioners' statutory and constitutional claims would make a difference if it were possible to argue, say, that the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only conspiracy. That is because a maximum sentence set by statute trumps a higher sentence set forth in the Guidelines. [United States Sentencing Commission, Guidelines Manual § 5G1.1 (Nov. 1994)]").

JUSTICE SCALIA, concurring.

I feel the need to say a few words in response to JUSTICE BREYER's dissent. It sketches an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. (Judges, it is sometimes necessary to remind ourselves, are part of the State—and an increasingly bureaucratic part of it, at that.) The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free.

As for fairness, which JUSTICE BREYER believes "[i]n modern times," *post*, at 555, the jury cannot provide: I think it not unfair to tell a prospective felon that if he commits his contemplated crime he is exposing himself to a jail sentence of 30 years—and that if, upon conviction, he gets anything less than that he may thank the mercy of a tenderhearted judge (just as he may thank the mercy of a tenderhearted parole commission if he is let out inordinately early, or the mercy of a tenderhearted governor if his sentence is commuted). Will there be disparities? Of course. But the criminal will never get *more* punishment than he bargained for when he did the crime, and his guilt of the crime (and hence the length of the sentence to which he is exposed) will be determined *beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.*

In JUSTICE BREYER's bureaucratic realm of perfect equity, by contrast, the facts that determine the length of sentence to which the defendant is exposed will be determined to exist (on a more-likely-than-not basis) by a single employee of the State. It is certainly arguable (JUSTICE BREYER argues it) that this sacrifice of prior protections is worth it. But it is not arguable that, just because one thinks it is a better system, it must be, or is even more likely to be, the system envisioned by a Constitution that guarantees trial by jury. What ultimately demolishes the case for the dis-

senters is that they are unable to say what the right to trial by jury *does* guarantee if, as they assert, it does not guarantee—what it has been assumed to guarantee throughout our history—the right to have a jury determine those facts that determine the maximum sentence the law allows. They provide no coherent alternative.

JUSTICE BREYER proceeds on the erroneous and all-too-common assumption that the Constitution means what we think it ought to mean. It does not; it means what it says. And the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury," has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins as to Parts I and II, concurring.

I join the opinion of the Court in full. I write separately to explain my view that the Constitution requires a broader rule than the Court adopts.

## I

This case turns on the seemingly simple question of what constitutes a "crime." Under the Federal Constitution, "the accused" has the right (1) "to be informed of the nature and cause of the accusation" (that is, the basis on which he is accused of a crime), (2) to be "held to answer for a capital, or otherwise infamous crime" only on an indictment or presentment of a grand jury, and (3) to be tried by "an impartial jury of the State and district wherein the crime shall have been committed." Amdts. 5 and 6. See also Art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be by Jury"). With the exception of the Grand Jury Clause, see *Hurtado* v. *California*, 110 U. S. 516, 538 (1884), the Court has held that these protections apply in state prosecutions, *Herring* v. *New York*, 422 U. S. 853, 857, and n. 7 (1975). Further, the Court has held that due process requires that the jury find

beyond a reasonable doubt every fact necessary to constitute the crime. *In re Winship*, 397 U. S. 358, 364 (1970).

All of these constitutional protections turn on determining which facts constitute the "crime"—that is, which facts are the "elements" or "ingredients" of a crime. In order for an accusation of a crime (whether by indictment or some other form) to be proper under the common law, and thus proper under the codification of the common-law rights in the Fifth and Sixth Amendments, it must allege all elements of that crime; likewise, in order for a jury trial of a crime to be proper, all elements of the crime must be proved to the jury (and, under *Winship*, proved beyond a reasonable doubt). See J. Story, Commentaries on the Constitution §§ 928–929, pp. 660–662, § 934, p. 664 (1833); J. Archbold, Pleading and Evidence in Criminal Cases *41, *99–*100 (hereinafter Archbold).[1]

Thus, it is critical to know which facts are elements. This question became more complicated following the Court's decision in *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), which spawned a special sort of fact known as a sentencing enhancement. See *ante*, at 478, 485, 494. Such a fact increases a defendant's punishment but is not subject to the constitutional protections to which elements are subject. JUSTICE O'CONNOR's dissent, in agreement with *McMillan* and *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998), takes the view that a legislature is free (within unspecified outer limits) to decree which facts are elements and which are sentencing enhancements. *Post*, at 524.

Sentencing enhancements may be new creatures, but the question that they create for courts is not. Courts have

---

[1] JUSTICE O'CONNOR mischaracterizes my argument. See *post*, at 527–528 (dissenting opinion). Of course the Fifth and Sixth Amendments did not codify common-law procedure wholesale. Rather, and as Story notes, they codified a few particular common-law procedural rights. As I have explained, the scope of those rights turns on what constitutes a "crime." In answering that question, it is entirely proper to look to the common law.

long had to consider which facts are elements in order to determine the sufficiency of an accusation (usually an indictment). The answer that courts have provided regarding the accusation tells us what an element is, and it is then a simple matter to apply that answer to whatever constitutional right may be at issue in a case—here, *Winship* and the right to trial by jury. A long line of essentially uniform authority addressing accusations, and stretching from the earliest reported cases after the founding until well into the 20th century, establishes that the original understanding of which facts are elements was even broader than the rule that the Court adopts today.

This authority establishes that a "crime" includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment). Thus, if the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact—of whatever sort, including the fact of a prior conviction—the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime. Similarly, if the legislature, rather than creating grades of crimes, has provided for setting the punishment of a crime based on some fact—such as a fine that is proportional to the value of stolen goods—that fact is also an element. No multifactor parsing of statutes, of the sort that we have attempted since *McMillan*, is necessary. One need only look to the kind, degree, or range of punishment to which the prosecution is by law entitled for a given set of facts. Each fact necessary for that entitlement is an element.

## II

### A

Cases from the founding to roughly the end of the Civil War establish the rule that I have described, applying it to

all sorts of facts, including recidivism. As legislatures varied common-law crimes and created new crimes, American courts, particularly from the 1840's on, readily applied to these new laws the common-law understanding that a fact that is by law the basis for imposing or increasing punishment is an element.[2]

Massachusetts, which produced the leading cases in the antebellum years, applied this rule as early as 1804, in *Commonwealth* v. *Smith,* 1 Mass. *245, and foreshadowed the fuller discussion that was to come. Smith was indicted for and found guilty of larceny, but the indictment failed to allege the value of all of the stolen goods. Massachusetts had abolished the common-law distinction between grand and simple larceny, replacing it with a single offense of larceny whose punishment (triple damages) was based on the value of the stolen goods. The prosecutor relied on this abolition of the traditional distinction to justify the indictment's omissions. The court, however, held that it could not sentence the defendant for the stolen goods whose value was not set out in the indictment. *Id.,* at *246–*247.

The understanding implicit in *Smith* was explained in *Hope* v. *Commonwealth,* 50 Mass. 134 (1845). Hope was indicted for and convicted of larceny. The larceny statute at

---

[2] It is strange that JUSTICE O'CONNOR faults me for beginning my analysis with cases primarily from the 1840's, rather from the time of the founding. See *post,* at 527–528 (dissenting opinion). As the Court explains, *ante,* at 478–480, and as she concedes, *post,* at 525 (O'CONNOR, J., dissenting), the very idea of a sentencing enhancement was foreign to the common law of the time of the founding. JUSTICE O'CONNOR therefore, and understandably, does not contend that any history from the founding supports her position. As far as I have been able to tell, the argument that a fact that was by law the basis for imposing or increasing punishment might not be an element did not seriously arise (at least not in reported cases) until the 1840's. As I explain below, from that time on—for at least a century—essentially all authority rejected that argument, and much of it did so in reliance upon the common law. I find this evidence more than sufficient.

issue retained the single-offense structure of the statute addressed in *Smith,* and established two levels of sentencing based on whether the value of the stolen property exceeded $100. The statute was structured similarly to the statutes that we addressed in *Jones* v. *United States,* 526 U. S. 227, 230 (1999), and, even more, *Castillo* v. *United States, ante,* at 122, in that it first set out the core crime and then, in subsequent clauses, set out the ranges of punishments.[3] Further, the statute opened by referring simply to "the offence of larceny," suggesting, at least from the perspective of our post-*McMillan* cases, that larceny was the crime whereas the value of the stolen property was merely a fact for sentencing. But the matter was quite simple for the Massachusetts high court. Value was an element because punishment varied with value:

> "Our statutes, it will be remembered, prescribe the punishment for larceny, with reference to the value of the property stolen; and for this reason, as well as because it is in conformity with long established practice, the court are of opinion that the value of the property alleged to be stolen must be set forth in the indictment." 50 Mass., at 137.

Two years after *Hope,* the court elaborated on this rule in a case involving burglary, stating that if "certain acts are, by force of the statutes, made punishable with greater severity, when accompanied with aggravating circumstances," then

---

[3] The Massachusetts statute provided: "Every person who shall commit the offence of larceny, by stealing of the property of another any money, goods or chattels [or other sort of property], if the property stolen shall exceed the value of one hundred dollars, shall be punished by imprisonment in the state prison, not more than five years, or by fine not exceeding six hundred dollars, and imprisonment in the county jail, not more than two years; and if the property stolen shall not exceed the value of one hundred dollars, he shall be punished by imprisonment in the state prison or the county jail, not more than one year, or by fine not exceeding three hundred dollars." Mass. Rev. Stat., ch. 126, § 17 (1836).

the statute has "creat[ed] two grades of crime." *Larned* v. *Commonwealth*, 53 Mass. 240, 242 (1847). See also *id.*, at 241 ("[T]here is a gradation of offences of the same species" where the statute sets out "various degrees of punishment").

Conversely, where a fact was *not* the basis for punishment, that fact was, for that reason, not an element. Thus, in *Commonwealth* v. *McDonald*, 59 Mass. 365 (1850), which involved an indictment for attempted larceny from the person, the court saw no error in the failure of the indictment to allege any value of the goods that the defendant had attempted to steal. The defendant, in challenging the indictment, apparently relied on *Smith* and *Hope*, and the court rejected his challenge by explaining that "[a]s the punishment . . . does not depend on the amount stolen, there was no occasion for any allegation as to value in this indictment." 59 Mass., at 367. See *Commonwealth* v. *Burke*, 94 Mass. 182, 183 (1866) (applying same reasoning to completed larceny from the person; finding no trial error where value was not proved to jury).

Similar reasoning was employed by the Wisconsin Supreme Court in *Lacy* v. *State*, 15 Wis. *13 (1862), in interpreting a statute that was also similar to the statutes at issue in *Jones* and *Castillo*. The statute, in a single paragraph, outlawed arson of a dwelling house at night. Arson that killed someone was punishable by life in prison; arson that did not kill anyone was punishable by 7 to 14 years in prison; arson of a house in which no person was lawfully dwelling was punishable by 3 to 10 years.[4] The court had no trouble

---

[4] The Wisconsin statute provided: "Every person who shall willfully and maliciously burn, in the night time, the dwelling house of another, whereby the life of any person shall be destroyed, or shall in the night time willfully and maliciously set fire to any other building, owned by himself or another, by the burning whereof such dwelling house shall be burnt in the night time, whereby the life of any person shall be destroyed, shall suffer the same punishment as provided for the crime of murder in the second degree; but if the life of no person shall have been destroyed, he shall be punished by imprisonment in the state prison, not more than fourteen

concluding that the statute "creates three distinct statutory offenses," 15 Wis., at *15, and that the lawful presence of a person in the dwelling was an element of the middle offense. The court reasoned from the gradations of punishment: "That the legislature considered the circumstance that a person was lawfully in the dwelling house when fire was set to it most material and important, and as greatly aggravating the crime, is clear from the severity of the punishment imposed." *Id.*, at *16. The "aggravating circumstances" created "the higher statutory offense[s]." *Id.*, at *17. Because the indictment did not allege that anyone had been present in the dwelling, the court reversed the defendant's 14-year sentence, but, relying on *Larned, supra,* the court remanded to permit sentencing under the lowest grade of the crime (which was properly alleged in the indictment). 15 Wis., at *17.

Numerous other state and federal courts in this period took the same approach to determining which facts are elements of a crime. See *Ritchey* v. *State,* 7 Blackf. 168, 169 (Ind. 1844) (citing *Commonwealth* v. *Smith,* 1 Mass. *245 (1804), and holding that indictment for arson must allege value of property destroyed, because statute set punishment based on value); *Spencer* v. *State,* 13 Ohio 401, 406, 408 (1844) (holding that value of goods intended to be stolen is not "an ingredient of the crime" of burglary with intent to steal, because punishment under statute did not depend on value; contrasting larceny, in which "[v]alue must be laid, and value proved, that the jury may find it, and the court, by that means, know whether it is grand or petit, and apply the grade of punishment the statute awards"); *United States* v. *Fisher,* 25 F. Cas. 1086 (CC Ohio 1849) (McLean, J.) ("A car-

---

years nor less than seven years; and if at the time of committing the offense there was no person lawfully in the dwelling house so burnt, he shall be punished by imprisonment in the state prison, not more than ten years nor less than three years." Wis. Rev. Stat., ch. 165, §1 (1858). The punishment for second-degree murder was life in prison. Ch. 164, §2.

rier of the mail is subject to a higher penalty where he steals a letter out of the mail, which contains an article of value. And when this offense is committed, the indictment must allege the letter contained an article of value, which aggravates the offense and incurs a higher penalty"); *Brightwell* v. *State*, 41 Ga. 482, 483 (1871) ("When the law prescribes a different punishment for different phases of the same crime, there is good reason for requiring the indictment to specify which of the phases the prisoner is charged with. The record ought to show that the defendant is convicted of the offense for which he is sentenced"). Cf. *State* v. *Farr*, 12 Rich. 24, 29 (S. C. App. 1859) (where two statutes barred purchasing corn from a slave, and one referred to purchasing from slave who lacked a permit, absence of permit was not an element, because both statutes had the same punishment).

Also demonstrating the common-law approach to determining elements was the well-established rule that, if a statute increased the punishment of a common-law crime, whether felony or misdemeanor, based on some fact, then that fact must be charged in the indictment in order for the court to impose the increased punishment. Archbold *106; see *id.*, at *50; *ante*, at 480–481. There was no question of treating the statutory aggravating fact as merely a sentencing enhancement—as a nonelement enhancing the sentence of the common-law crime. The aggravating fact was an element of a new, aggravated grade of the common-law crime simply because it increased the punishment of the common-law crime. And the common-law crime was, in relation to the statutory one, essentially just like any other lesser included offense. See Archbold *106.

Further evidence of the rule that a crime includes every fact that is by law a basis for imposing or increasing punishment comes from early cases addressing recidivism statutes. As JUSTICE SCALIA has explained, there was a tradition of treating recidivism as an element. See *Almendarez-Torres*, 523 U. S., at 256–257, 261 (dissenting opinion). That tradi-

tion stretches back to the earliest years of the Republic. See, *e. g., Commonwealth* v. *Welsh,* 4 Va. 57 (1817); *Smith* v. *Commonwealth,* 14 Serg. & Rawle 69 (Pa. 1826); see also Archbold *695–*696. For my purposes, however, what is noteworthy is not so much the fact of that tradition as the reason for it: Courts treated the fact of a prior conviction just as any other fact that increased the punishment by law. By the same reasoning that the courts employed in *Hope, Lacy,* and the other cases discussed above, the fact of a prior conviction was an element, together with the facts constituting the core crime of which the defendant was charged, of a new, aggravated crime.

The two leading antebellum cases on whether recidivism is an element were *Plumbly* v. *Commonwealth,* 43 Mass. 413 (1841), and *Tuttle* v. *Commonwealth,* 68 Mass. 505 (1854). In the latter, the court explained the reason for treating as an element the fact of the prior conviction:

> "When the statute imposes a higher penalty upon a second and third conviction, respectively, it makes the prior conviction of a similar offence a part of the description and character of the offence intended to be punished; and therefore the fact of such prior conviction must be charged, as well as proved. It is essential to an indictment, that the facts constituting the offence intended to be punished should be averred." *Id.,* at 506.

The court rested this rule on the common law and the Massachusetts equivalent of the Sixth Amendment's Notice Clause. *Ibid.* See also *Commonwealth* v. *Haynes,* 107 Mass. 194, 198 (1871) (reversing sentence, upon confession of error by attorney general, in case similar to *Tuttle*).

Numerous other cases treating the fact of a prior conviction as an element of a crime take the same view. They make clear, by both their holdings and their language, that when a statute increases punishment for some core crime based on the fact of a prior conviction, the core crime and

the fact of the prior crime together create a new, aggravated crime. *Kilbourn* v. *State,* 9 Conn. 560, 563 (1833) ("No person ought to be, or can be, subjected to a cumulative penalty, without being charged with a cumulative offence"); *Plumbly, supra,* at 414 (conviction under recidivism statute is "one conviction, upon one aggregate offence"); *Hines* v. *State,* 26 Ga. 614, 616 (1859) (reversing enhanced sentence imposed by trial judge and explaining: "[T]he question, whether the offence was a second one, or not, was a question for the jury. . . . The allegation [of a prior offence] is certainly one of the first importance to the accused, for if it is true, he becomes subject to a greatly increased punishment"). See also *Commonwealth* v. *Phillips,* 28 Mass. 28, 33 (1831) ("[U]pon a third conviction, the court may sentence the convict to hard labor for life. The punishment is to be awarded upon that conviction, and for the offence of which he is then and there convicted").

Even the exception to this practice of including the fact of a prior conviction in the indictment and trying it to the jury helps to prove the rule that that fact is an element because it increases the punishment by law. In *State* v. *Freeman,* 27 Vt. 523 (1855), the Vermont Supreme Court upheld a statute providing that, in an indictment or complaint for violation of a liquor law, it was not necessary to allege a prior conviction of that law in order to secure an increased sentence. But the court did not hold that the prior conviction was not an element; instead, it held that the liquor law created only minor offenses that did not qualify as crimes. Thus, the state constitutional protections that would attach were a "crime" at issue did not apply. *Id.,* at 527; see *Goeller* v. *State,* 119 Md. 61, 66–67, 85 A. 954, 956 (1912) (discussing *Freeman*). At the same time, the court freely acknowledged that it had "no doubt" of the general rule, particularly as articulated in Massachusetts, that "it is necessary to allege the former conviction, in the indictment, when a higher

sentence is claimed on that account." *Freeman, supra,* at 526. Unsurprisingly, then, a leading treatise explained *Freeman* as only "apparently" contrary to the general rule and as involving a "special statute." 3 F. Wharton, Criminal Law § 3417, p. 307, n. *r* (7th rev. ed. 1874) (hereinafter Wharton). In addition, less than a decade after *Freeman,* the same Vermont court held that if a defendant charged with a successive violation of the liquor laws contested identity—that is, whether the person in the record of the prior conviction was the same as the defendant—he should be permitted to have a jury resolve the question. *State* v. *Haynes,* 35 Vt. 570, 572–573 (1863). (*Freeman* itself had anticipated this holding by suggesting the use of a jury to resolve disputes over identity. See 27 Vt., at 528.) In so holding, *Haynes* all but applied the general rule, since a determination of identity was usually the chief factual issue whenever recidivism was charged. See Archbold \*695–\*696; see also, *e. g., Graham* v. *West Virginia,* 224 U. S. 616, 620–621 (1912) (defendant had been convicted under three different names).[5]

---

[5] Some courts read *State* v. *Smith,* 8 Rich. 460 (S. C. App. 1832), a South Carolina case, to hold that the indictment need not allege a prior conviction in order for the defendant to suffer an enhanced punishment. See, *e. g., State* v. *Burgett,* 22 Ark. 323, 324 (1860) (so reading *Smith* and questioning its correctness). The *Smith* court's holding was somewhat unclear because the court did not state whether the case involved a first or second offense—if a first, the court was undoubtedly correct in rejecting the defendant's challenge to the indictment, because there is no need in an indictment to negate the existence of any prior offense. See *Burgett, supra,* at 324 (reading indictment that was silent about prior offenses as only charging first offense and as sufficient for that purpose). In addition, the *Smith* court did not acknowledge the possibility of disputes over identity. Finally, the extent to which the court's apparent holding was followed in practice in South Carolina is unclear, and subsequent South Carolina decisions acknowledged that *Smith* was out of step with the general rule. See *State* v. *Parris,* 89 S. C. 140, 141, 71 S. E. 808, 809 (1911); *State* v. *Mitchell,* 220 S. C. 433, 434–436, 68 S. E. 2d 350, 351–352 (1951).

## B

An 1872 treatise by one of the leading authorities of the era in criminal law and procedure confirms the common-law understanding that the above cases demonstrate. The treatise condensed the traditional understanding regarding the indictment, and thus regarding the elements of a crime, to the following: "[T]he indictment must allege whatever is in law essential to the punishment sought to be inflicted." 1 J. Bishop, Law of Criminal Procedure 50 (2d ed. 1872) (hereinafter Bishop, Criminal Procedure). See *id.*, § 81, at 51 ("[T]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted"); *id.*, § 540, at 330 ("[T]he indictment must . . . contain an averment of every particular thing which enters into the punishment"). Crimes, he explained, consist of those "acts to which the law affixes . . . punishment," *id.*, § 80, at 51, or, stated differently, a crime consists of the whole of "the wrong upon which the punishment is based," *id.*, § 84, at 53. In a later edition, Bishop similarly defined the elements of a crime as "that wrongful aggregation out of which the punishment proceeds." 1 J. Bishop, New Criminal Procedure § 84, p. 49 (4th ed. 1895).

Bishop grounded his definition in both a generalization from well-established common-law practice, 1 Bishop, Criminal Procedure §§ 81–84, at 51–53, and in the provisions of Federal and State Constitutions guaranteeing notice of an accusation in all criminal cases, indictment by a grand jury for serious crimes, and trial by jury. With regard to the common law, he explained that his rule was "not made apparent to our understandings by a single case only, but by all the cases," *id.*, § 81, at 51, and was followed "in all cases, without one exception," *id.*, § 84, at 53. To illustrate, he observed that there are

> "various statutes whereby, when . . . assault is committed with a particular intent, or with a particular

weapon, or the like, it is subjected to a particular corresponding punishment, heavier than that for common assault, or differing from it, pointed out by the statute. And the reader will notice that, in all cases where the peculiar or aggravated punishment is to be inflicted, the peculiar or aggravating matter is required to be set out in the indictment." *Id.*, § 82, at 52.

He also found burglary statutes illustrative in the same way. *Id.*, § 83, at 52–53. Bishop made no exception for the fact of a prior conviction—he simply treated it just as any other aggravating fact: "[If] it is sought to make the sentence heavier by reason of its being [a second or third offence], the fact thus relied on must be averred in the indictment; because the rules of criminal procedure require the indictment, in all cases, to contain an averment of every fact essential to the punishment sought to be inflicted." 1 J. Bishop, Commentaries on Criminal Law § 961, pp. 564–565 (5th ed. 1872).

The constitutional provisions provided further support, in his view, because of the requirements for a proper accusation at common law and because of the common-law understanding that a proper jury trial required a proper accusation: "The idea of a jury trial, as it has always been known where the common law prevails, includes the allegation, as part of the machinery of the trial . . . . [A]n accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation within the requirements of the common law, and it is no accusation in reason." 1 Bishop, Criminal Procedure § 87, at 55. See *id.*, § 88, at 56 (notice and indictment requirements ensure that before "persons held for crimes . . . shall be convicted, there shall be an allegation made against them of every element of crime which the law makes essential to the punishment to be inflicted").

Numerous high courts contemporaneously and explicitly agreed that Bishop had accurately captured the common-law understanding of what facts are elements of a crime. See,

*e. g., Hobbs* v. *State,* 44 Tex. 353, 354 (1875) (favorably quoting 1 Bishop, Criminal Procedure § 81); *Maguire* v. *State,* 47 Md. 485, 497 (1878) (approvingly citing different Bishop treatise for the same rule); *Larney* v. *Cleveland,* 34 Ohio St. 599, 600 (1878) (rule and reason for rule "are well stated by Mr. Bishop"); *State* v. *Hayward,* 83 Mo. 299, 307 (1884) (extensively quoting § 81 of Bishop's "admirable treatise"); *Riggs* v. *State,* 104 Ind. 261, 262, 3 N. E. 886, 887 (1885) ("We agree with Mr. Bishop that the nature and cause of the accusation are not stated where there is no mention of the full act or series of acts for which the punishment is to be inflicted" (internal quotation marks omitted)); *State* v. *Perley,* 86 Me. 427, 431, 30 A. 74, 75 (1894) ("The doctrine of the court, says Mr. Bishop, is identical with that of reason, viz: that the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted" (internal quotation marks omitted)); see also *United States* v. *Reese,* 92 U. S. 214, 232–233 (1876) (Clifford, J., concurring in judgment) (citing and paraphrasing 1 Bishop, Criminal Procedure § 81).

## C

In the half century following publication of Bishop's treatise, numerous courts applied his statement of the common-law understanding; most of them explicitly relied on his treatise. Just as in the earlier period, every fact that was by law a basis for imposing or increasing punishment (including the fact of a prior conviction) was an element. Each such fact had to be included in the accusation of the crime and proved to the jury.

Courts confronted statutes quite similar to the ones with which we have struggled since *McMillan,* and, applying the traditional rule, they found it not at all difficult to determine whether a fact was an element. In *Hobbs, supra,* the defendant was indicted for a form of burglary punishable by 2 to 5 years in prison. A separate statutory section provided for an increased sentence, up to double the punishment

to which the defendant would otherwise be subject, if the entry into the house was effected by force exceeding that incidental to burglary. The trial court instructed the jury to sentence the defendant to 2 to 10 years if it found the requisite level of force, and the jury sentenced him to 3. The Texas Supreme Court, relying on Bishop, reversed because the indictment had not alleged such force; even though the jury had sentenced Hobbs within the range (2 to 5 years) that was permissible under the lesser crime that the indictment had charged, the court thought it "impossible to say . . . that the erroneous charge of the court may not have had some weight in leading the jury" to impose the sentence that it did. 44 Tex., at 355.[6] See also *Searcy* v. *State*, 1 Tex. App. 440, 444 (1876) (similar); *Garcia* v. *State*, 19 Tex. App. 389, 393 (1885) (not citing *Hobbs*, but relying on Bishop to reverse 10-year sentence for assault with a bowie knife or dagger, where statute doubled range for assault from 2 to 7 to 4 to 14 years if the assault was committed with either weapon but where indictment had not so alleged).

As in earlier cases, such as *McDonald* (discussed *supra*, at 504), courts also used the converse of the Bishop rule to explain when a fact was not an element of the crime. In *Perley*, *supra*, the defendant was indicted for and convicted of robbery, which was punishable by imprisonment for life

---

[6] The gulf between the traditional approach to determining elements and that of our recent cases is manifest when one considers how one might, from the perspective of those cases, analyze the issue in *Hobbs*. The chapter of the Texas code addressing burglary was entitled simply "Of Burglary" and began with a section explicitly defining "the offense of burglary." After a series of sections defining terms, it then set out six separate sections specifying the punishment for various kinds of burglary. The section regarding force was one of these. See 1 G. Paschal, Digest of Laws of Texas, Part II, Tit. 20, ch. 6, pp. 462–463 (4th ed. 1875). Following an approach similar to that in *Almendarez-Torres* v. *United States*, 523 U. S. 224, 231–234, 242–246 (1998), and *Castillo* v. *United States, ante*, at 124–125, one would likely find a clear legislative intent to make force a sentencing enhancement rather than an element.

or any term of years. The court, relying on Bishop, *Hope*, *McDonald*, and other authority, rejected his argument that Maine's Notice Clause (which of course required all elements to be alleged) required the indictment to allege the value of the goods stolen, because the punishment did not turn on value: "[T]here is no provision of this statute which makes the amount of property taken an essential element of the offense; and there is no statute in this State which creates degrees in robbery, or in any way makes the punishment of the offense dependent upon the value of the property taken." 86 Me., at 432, 30 A., at 75. The court further explained that "where the value is not essential to the punishment it need not be distinctly alleged or proved." *Id.*, at 433, 30 A., at 76.

Reasoning similar to *Perley* and the Texas cases is evident in other cases as well. See *Jones* v. *State*, 63 Ga. 141, 143 (1879) (where punishment for burglary in the day is 3 to 5 years in prison and for burglary at night is 5 to 20, time of burglary is a "constituent of the offense"; indictment should "charge all that is requisite to render plain and certain every constituent of the offense"); *United States* v. *Woodruff*, 68 F. 536, 538 (Kan. 1895) (where embezzlement statute "contemplates that there should be an ascertainment of the exact sum for which a fine may be imposed" and jury did not determine amount, judge lacked authority to impose fine; "[o]n such an issue the defendant is entitled to his constitutional right of trial by jury").

Courts also, again just as in the pre-Bishop period, applied the same reasoning to the fact of a prior conviction as they did to any other fact that aggravated the punishment by law. Many, though far from all, of these courts relied on Bishop. In 1878, Maryland's high court, in *Maguire* v. *State*, 47 Md. 485, stated the rule and the reason for it in language indistinguishable from that of *Tuttle* a quarter century before:

> "The law would seem to be well settled, that if the party be proceeded against for a second or third offence under

the statute, and the sentence prescribed be different from the first, or severer, by reason of its being such second or third offence, the fact thus relied on must be averred in the indictment; for the settled rule is, that the indictment must contain an averment of every fact essential to justify the punishment inflicted." *Maguire, supra,* at 496 (citing English cases, *Plumbly* v. *Commonwealth,* 43 Mass. 413 (1841), Wharton, and Bishop).

In *Goeller* v. *State,* 119 Md. 61, 85 A. 954 (1912), the same court reaffirmed *Maguire* and voided, as contrary to Maryland's Notice Clause, a statute that permitted the trial judge to determine the fact of a prior conviction. The court extensively quoted Bishop, who had, in the court's view, treated the subject "more fully, perhaps, than any other legal writer," and it cited, among other authorities, "a line of Massachusetts decisions" and *Riggs* (quoted *supra,* at 512). 119 Md., at 66, 85 A., at 955. In *Larney,* 34 Ohio St., at 600–601, the Supreme Court of Ohio, in an opinion citing only Bishop, reversed a conviction under a recidivism statute where the indictment had not alleged any prior conviction. (The defendant had also relied on *Plumbly, supra,* and *Kilbourn* v. *State,* 9 Conn. 560 (1833). 34 Ohio St., at 600.) And in *State* v. *Adams,* 64 N. H. 440, 13 A. 785 (1888), the court, relying on Bishop, explained that "[t]he former conviction being a part of the description and character of the offense intended to be punished, because of the higher penalty imposed, it must be alleged." *Id.,* at 442, 13 A., at 786. The defendant had been "charged with an offense aggravated by its repetitious character." *Ibid.* See also *Evans* v. *State,* 150 Ind. 651, 653, 50 N. E. 820 (1898) (similar); *Shiflett* v. *Commonwealth,* 114 Va. 876, 877, 77 S. E. 606, 607 (1913) (similar).

Even without any reliance on Bishop, other courts addressing recidivism statutes employed the same reasoning as did he and the above cases—that a crime includes any fact to which punishment attaches. One of the leading cases was

*Wood* v. *People,* 53 N. Y. 511 (1873). The statute in *Wood* provided for increased punishment if the defendant had previously been convicted of a felony then discharged from the conviction. The court, repeatedly referring to "the aggravated offence," *id.,* at 513, 515, held that the facts of the prior conviction and of the discharge must be proved to the jury, for "[b]oth enter into and make a part of the offence . . . subjecting the prisoner to the increased punishment." *Id.,* at 513; see *ibid.* (fact of prior conviction was an "essential ingredient" of the offense). See also *Johnson* v. *People,* 55 N. Y. 512, 514 (1874) ("A more severe penalty is denounced by the statute for a second offence; and all the facts to bring the case within the statute must be [alleged in the indictment and] established on the trial"); *People* v. *Sickles,* 156 N. Y. 541, 544–545, 51 N. E. 288, 289 (1898) (reaffirming *Wood* and *Johnson* and explaining that "the charge is not merely that the prisoner has committed the offense specifically described, but that, as a former convict, his second offense has subjected him to an enhanced penalty").

Contemporaneously with the New York Court of Appeals in *Wood* and *Johnson,* state high courts in California and Pennsylvania offered similar explanations for why the fact of a prior conviction is an element. In *People* v. *Delany,* 49 Cal. 394 (1874), which involved a statute making petit larceny (normally a misdemeanor) a felony if committed following a prior conviction for petit larceny, the court left no doubt that the fact of the prior conviction was an element of an aggravated crime consisting of petit larceny committed following a prior conviction for petit larceny:

> "The particular circumstances of the offense are stated [in the indictment], and consist of the prior convictions and of the facts constituting the last larceny.
>
> . . . . .
>
> "[T]he former convictions are made to adhere to and constitute a portion of the aggravated offense." *Id.,* at 395.

"The felony consists both of the former convictions and of the particular larceny. . . . [T]he former convictions were a separate fact; which, taken in connection with the facts constituting the last offense, make a distinct and greater offense than that charged, exclusive of the prior convictions." *Id.*, at 396.[7]

See also *People* v. *Coleman*, 145 Cal. 609, 610–611, 79 P. 283, 284–285 (1904).

Similarly, in *Rauch* v. *Commonwealth*, 78 Pa. 490 (1876), the court applied its 1826 decision in *Smith* v. *Commonwealth*, 14 Serg. & Rawle 69, and reversed the trial court's imposition of an enhanced sentence "upon its own knowledge of its records." 78 Pa., at 494. The court explained that "imprisonment in jail is not a lawful consequence of a mere conviction for an unlawful sale of liquors. It is the lawful consequence of a second sale only after a former conviction. On every principle of personal security and the due administration of justice, the fact which gives rightfulness to the greater punishment should appear in the record." *Ibid.* See also *id.*, at 495 ("But clearly the substantive offence, which draws to itself the greater punishment, is the unlawful sale after a former conviction. This, therefore, is the very offence he is called upon to defend against").

Meanwhile, Massachusetts reaffirmed its earlier decisions, striking down, in *Commonwealth* v. *Harrington*, 130 Mass. 35 (1880), a liquor law that provided a small fine for a first or second conviction, provided a larger fine or imprisonment up to a year for a third conviction, and specifically provided that a prior conviction need not be alleged in the complaint. The court found this law plainly inconsistent with *Tuttle* and with the State's Notice Clause, explaining that "the offence which is punishable with the higher penalty is not fully and

---

[7] The court held that a general plea of "guilty" to an indictment that includes an allegation of a prior conviction applies to the fact of the prior conviction.

substantially described to the defendant, if the complaint fails to set forth the former convictions which are essential features of it." 130 Mass., at 36.[8]

Without belaboring the point any further, I simply note that this traditional understanding—that a "crime" includes every fact that is by law a basis for imposing or increasing punishment—continued well into the 20th century, at least until the middle of the century. See Knoll & Singer, Searching for the "Tail of the Dog": Finding "Elements" of Crimes in the Wake of *McMillan v. Pennsylvania*, 22 Seattle U. L. Rev. 1057, 1069–1081 (1999) (surveying 20th-century decisions of federal courts prior to *McMillan*); see also *People v. Ratner*, 67 Cal. App. 2d Supp. 902, 903–906, 153 P. 2d 790, 791–793 (1944). In fact, it is fair to say that *McMillan* began a revolution in the law regarding the definition of "crime." Today's decision, far from being a sharp break with the past, marks nothing more than a return to the *status quo ante*—the status quo that reflected the original meaning of the Fifth and Sixth Amendments.

## III

The consequence of the above discussion for our decisions in *Almendarez-Torres* and *McMillan* should be plain enough, but a few points merit special mention.

---

[8] See also *State v. Austin*, 113 Mo. 538, 542, 21 S. W. 31, 32 (1893) (prior conviction is a "material fac[t]" of the "aggravated offense"); *Bandy v. Hehn*, 10 Wyo. 167, 172–174, 67 P. 979, 980 (1902) ("[I]n reason, and by the great weight of authority, as the fact of a former conviction enters into the offense to the extent of aggravating it and increasing the punishment, it must be alleged in the information and proved like any other material fact, if it is sought to impose the greater penalty. The statute makes the prior conviction a part of the description and character of the offense intended to be punished" (citing *Tuttle v. Commonwealth*, 68 Mass. 505 (1854))); *State v. Smith*, 129 Iowa 709, 711–712, 106 N. W. 187, 188–189 (1906) (similar); *State v. Scheminisky*, 31 Idaho 504, 506–507, 174 P. 611, 611–612 (1918) (similar).

First, it is irrelevant to the question of which facts are elements that legislatures have allowed sentencing judges discretion in determining punishment (often within extremely broad ranges). See *ante*, at 481–482; *post*, at 544–545 (O'CONNOR, J., dissenting). Bishop, immediately after setting out the traditional rule on elements, explained why:

> "The reader should distinguish between the foregoing doctrine, and the doctrine . . . that, within the limits of any discretion as to the punishment which the law may have allowed, the judge, when he pronounces sentence, may suffer his discretion to be influenced by matter shown in aggravation or mitigation, not covered by the allegations of the indictment. . . . The aggravating circumstances spoken of cannot swell the penalty above what the law has provided for the acts charged against the prisoner, and they are interposed merely to check the judicial discretion in the exercise of the permitted mercy [in finding mitigating circumstances]. This is an entirely different thing from punishing one for what is not alleged against him." 1 Bishop, Criminal Procedure § 85, at 54.

See also 1 J. Bishop, New Commentaries on the Criminal Law §§ 600–601, pp. 370–371, § 948, p. 572 (8th ed. 1892) (similar). In other words, establishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things.[9]

---

[9] This is not to deny that there may be laws on the borderline of this distinction. In *Brightwell* v. *State*, 41 Ga. 482 (1871), the court stated a rule for elements equivalent to Bishop's, then held that whether a defendant had committed arson in the day or at night need not be in the indictment. The court explained that there was "no provision that arson in the night shall be punished for any different period" than arson in the day (both being punishable by 2 to 7 years in prison). *Id.*, at 483. Although there was a statute providing that "arson in the day time shall be punished for a less period than arson in the night time," the court concluded that it merely set "a rule for the exercise of [the sentencing

Cf. 4 W. Blackstone, Commentaries on the Law of England 371–372 (1769) (noting judges' broad discretion in setting amount of fine and length of imprisonment for misdemeanors, but praising determinate punishment and "discretion . . . regulated by law"); *Perley,* 86 Me., at 429, 432, 30 A., at 74, 75–76 (favorably discussing Bishop's rule on elements without mentioning, aside from quotation of statute in statement of facts, that defendant's conviction for robbery exposed him to imprisonment for life or any term of years). Thus, it is one thing to consider what the Constitution requires the prosecution to do in order to entitle itself to a particular kind, degree, or range of punishment of the accused, see *Woodruff,* 68 F., at 538, and quite another to consider what constitutional constraints apply either to the imposition of punishment within the limits of that entitlement or to a legislature's ability to set broad ranges of punishment. In answering the former constitutional question, I need not, and do not, address the latter.

Second, and related, one of the chief errors of *Almendarez-Torres*—an error to which I succumbed—was to attempt to discern whether a particular fact is traditionally (or typically) a basis for a sentencing court to increase an offender's sentence. 523 U. S., at 243–244; see *id.,* at 230, 241. For the

---

judge's] discretion" by specifying a particular fact for the judge to consider along with the many others that would enter into his sentencing decision. *Ibid.* Cf. *Jones* v. *State,* 63 Ga. 141, 143 (1879) (whether burglary occurred in day or at night is a "constituent of the offense" because law fixes different ranges of punishment based on this fact). And the statute attached no definite consequence to that particular fact: A sentencing judge presumably could have imposed a sentence of seven years less one second for daytime arson. Finally, it is likely that the statute in *Brightwell,* given its language ("a less period") and its placement in a separate section, was read as setting out an affirmative defense or mitigating circumstance. See *Wright* v. *State,* 113 Ga. App. 436, 437–438, 148 S. E. 2d 333, 335–336 (1966) (suggesting that it would be error to refuse to charge later version of this statute to jury upon request of defendant). See generally Archbold *52, *105–*106 (discussing rules for determining whether fact is an element or a defense).

reasons I have given, it should be clear that this approach just defines away the real issue. What matters is the way by which a fact enters into the sentence. If a fact is by law the basis for imposing or increasing punishment—for establishing or increasing the prosecution's entitlement—it is an element. (To put the point differently, I am aware of no historical basis for treating as a nonelement a fact that by law sets or increases punishment.) When one considers the question from this perspective, it is evident why the fact of a prior conviction is an element under a recidivism statute. Indeed, cases addressing such statutes provide some of the best discussions of what constitutes an element of a crime. One reason frequently offered for treating recidivism differently, a reason on which we relied in *Almendarez-Torres, supra,* at 235, is a concern for prejudicing the jury by informing it of the prior conviction. But this concern, of which earlier courts were well aware, does not make the traditional understanding of what an element is any less applicable to the fact of a prior conviction. See, *e. g., Maguire,* 47 Md., at 498; *Sickles,* 156 N. Y., at 547, 51 N. E., at 290.[10]

Third, I think it clear that the common-law rule would cover the *McMillan* situation of a mandatory minimum sentence (in that case, for visible possession of a firearm during the commission of certain crimes). No doubt a defendant could, under such a scheme, find himself sentenced to the same term to which he could have been sentenced absent the mandatory minimum. The range for his underlying crime

---

[10] In addition, it has been common practice to address this concern by permitting the defendant to stipulate to the prior conviction, in which case the charge of the prior conviction is not read to the jury, or, if the defendant decides not to stipulate, to bifurcate the trial, with the jury only considering the prior conviction after it has reached a guilty verdict on the core crime. See, *e. g.,* 1 J. Bishop, Criminal Law § 964, pp. 566–567 (5th ed. 1872) (favorably discussing English practice of bifurcation); *People* v. *Saunders,* 5 Cal. 4th 580, 587–588, 853 P. 2d 1093, 1095–1096 (1993) (detailing California approach, since 1874, of permitting stipulation and, more recently, of also permitting bifurcation).

could be 0 to 10 years, with the mandatory minimum of 5 years, and he could be sentenced to 7. (Of course, a similar scenario is possible with an increased maximum.) But it is equally true that his expected punishment has increased as a result of the narrowed range and that the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish. The mandatory minimum "entitl[es] the government," *Woodruff, supra,* at 538, to more than it would otherwise be entitled (5 to 10 years, rather than 0 to 10 and the risk of a sentence below 5). Thus, the fact triggering the mandatory minimum is part of "the punishment sought to be inflicted," Bishop, Criminal Procedure 50; it undoubtedly "enters into the punishment" so as to aggravate it, *id.,* § 540, at 330, and is an "ac[t] to which the law affixes . . . punishment," *id.,* § 80, at 51. Further, just as in *Hobbs* and *Searcy,* see *supra,* at 512–513, it is likely that the change in the range available to the judge affects his choice of sentence. Finally, in numerous cases, such as *Lacy, Garcia,* and *Jones,* see *supra,* at 504–505, 514, the aggravating fact raised the whole range— both the top and bottom. Those courts, in holding that such a fact was an element, did not bother with any distinction between changes in the maximum and the minimum. What mattered was simply the overall increase in the punishment provided by law. And in several cases, such as *Smith* and *Woodruff,* see *supra,* at 502, 514, the very concept of maximums and minimums had no applicability, yet the same rule for elements applied. See also *Harrington* (discussed *supra,* at 517–518).

Finally, I need not in this case address the implications of the rule that I have stated for the Court's decision in *Walton* v. *Arizona,* 497 U. S. 639, 647–649 (1990). See *ante,* at 496. *Walton* did approve a scheme by which a judge, rather than a jury, determines an aggravating fact that makes a convict eligible for the death penalty, and thus eligible for a greater punishment. In this sense, that fact is an element. But that scheme exists in a unique context, for in the area of cap-

ital punishment, unlike any other area, we have imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment—we have restricted the legislature's ability to define crimes. Under our recent capital-punishment jurisprudence, neither Arizona nor any other jurisdiction could provide—as, previously, it freely could and did—that a person shall be death eligible automatically upon conviction for certain crimes. We have interposed a barrier between a jury finding of a capital crime and a court's ability to impose capital punishment. Whether this distinction between capital crimes and all others, or some other distinction, is sufficient to put the former outside the rule that I have stated is a question for another day.[11]

\* \* \*

For the foregoing reasons, as well as those given in the Court's opinion, I agree that the New Jersey procedure at issue is unconstitutional.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE BREYER join, dissenting.

Last Term, in *Jones* v. *United States*, 526 U. S. 227 (1999), this Court found that our prior cases suggested the following principle: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.*, at 243, n. 6. At the time, JUSTICE KENNEDY rightly criticized the Court for its failure to ex-

---

[11] It is likewise unnecessary to consider whether (and, if so, how) the rule regarding elements applies to the Sentencing Guidelines, given the unique status that they have under *Mistretta* v. *United States*, 488 U. S. 361 (1989). But it may be that this special status is irrelevant, because the Guidelines "have the force and effect of laws." *Id.*, at 413 (SCALIA, J., dissenting).

plain the origins, contours, or consequences of its purported constitutional principle; for the inconsistency of that principle with our prior cases; and for the serious doubt that the holding cast on sentencing systems employed by the Federal Government and States alike. *Id.*, at 254, 264–272 (dissenting opinion). Today, in what will surely be remembered as a watershed change in constitutional law, the Court imposes as a constitutional rule the principle it first identified in *Jones.*

I

Our Court has long recognized that not every fact that bears on a defendant's punishment need be charged in an indictment, submitted to a jury, and proved by the government beyond a reasonable doubt. Rather, we have held that the "legislature's definition of the elements of the offense is usually dispositive." *McMillan* v. *Pennsylvania,* 477 U. S. 79, 85 (1986); see also *Almendarez-Torres* v. *United States,* 523 U. S. 224, 228 (1998); *Patterson* v. *New York,* 432 U. S. 197, 210, 211, n. 12 (1977). Although we have recognized that "there are obviously constitutional limits beyond which the States may not go in this regard," *id.*, at 210, and that "in certain limited circumstances *Winship*'s reasonable-doubt requirement applies to facts not formally identified as elements of the offense charged," *McMillan, supra,* at 86, we have proceeded with caution before deciding that a certain fact must be treated as an offense element despite the legislature's choice not to characterize it as such. We have therefore declined to establish any bright-line rule for making such judgments and have instead approached each case individually, sifting through the considerations most relevant to determining whether the legislature has acted properly within its broad power to define crimes and their punishments or instead has sought to evade the constitutional requirements associated with the characterization of a fact as an offense element. See, *e. g., Monge* v. *California,* 524 U. S. 721, 728–729 (1998); *McMillan, supra,* at 86.

In one bold stroke the Court today casts aside our traditional cautious approach and instead embraces a universal and seemingly bright-line rule limiting the power of Congress and state legislatures to define criminal offenses and the sentences that follow from convictions thereunder. The Court states: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Ante*, at 490. In its opinion, the Court marshals virtually no authority to support its extraordinary rule. Indeed, it is remarkable that the Court cannot identify a *single instance*, in the over 200 years since the ratification of the Bill of Rights, that our Court has applied, as a constitutional requirement, the rule it announces today.

According to the Court, its constitutional rule "emerges from our history and case law." *Ante*, at 492. None of the history contained in the Court's opinion requires the rule it ultimately adopts. The history cited by the Court can be divided into two categories: first, evidence that judges at common law had virtually no discretion in sentencing, *ante*, at 478–480, and, second, statements from a 19th-century criminal procedure treatise that the government must charge in an indictment and prove at trial the elements of a statutory offense for the defendant to be sentenced to the punishment attached to that statutory offense, *ante*, at 480–481. The relevance of the first category of evidence can be easily dismissed. Indeed, the Court does not even claim that the historical evidence of nondiscretionary sentencing at common law supports its "increase in the maximum penalty" rule. Rather, almost as quickly as it recites that historical practice, the Court rejects its relevance to the constitutional question presented here due to the conflicting American practice of judges exercising sentencing discretion and our decisions recognizing the legitimacy of that American practice. See *ante*, at 481–482 (citing *Williams* v. *New York*, 337 U. S. 241, 246 (1949)). Even if the Court were to

claim that the common-law history on this point did bear on the instant case, one wonders why the historical practice of judges pronouncing judgments in cases between private parties is relevant at all to the question of criminal punishment presented here. See *ante*, at 479–480 (quoting 3 W. Blackstone, Commentaries on the Laws of England 396 (1768), which pertains to "remed[ies] prescribed by law for the redress of injuries").

Apparently, then, the historical practice on which the Court places so much reliance consists of only two quotations taken from an 1862 criminal procedure treatise. See *ante*, at 480–481 (quoting J. Archbold, Pleading and Evidence in Criminal Cases 51, 188 (15th ed. 1862)). A closer examination of the two statements reveals that neither supports the Court's "increase in the maximum penalty" rule. Both of the excerpts pertain to circumstances in which a common-law felony had also been made a separate statutory offense carrying a greater penalty. Taken together, the statements from the Archbold treatise demonstrate nothing more than the unremarkable proposition that a defendant could receive the greater statutory punishment only if the indictment expressly charged and the prosecutor proved the facts that made up the statutory offense, as opposed to simply those facts that made up the common-law offense. See *id.*, at 51 (indictment); *id.*, at 188 (proof). In other words, for the defendant to receive the statutory punishment, the prosecutor had to charge in the indictment and prove at trial *the elements* of the statutory offense. To the extent there is any doubt about the precise meaning of the treatise excerpts, that doubt is dispelled by looking to the treatise sections from which the excerpts are drawn and the broader principle each section is meant to illustrate. See *id.*, at 43 ("Every offence consists of certain acts done or omitted under certain circumstances; and in an indictment for the offence, it is not sufficient to charge the defendant generally with having committed it, . . . but all the facts and circumstances constituting

the offence must be specially set forth"); *id.*, at 180 ("Every offence consists of certain acts done or omitted, under certain circumstances, all of which must be stated in the indictment . . . and be proved as laid"). And, to the extent further clarification is needed, the authority cited by the Archbold treatise to support its stated proposition with respect to the requirements of an indictment demonstrates that the treatise excerpts mean only that the prosecutor must charge and then prove at trial *the elements* of the statutory offense. See 2 M. Hale, Pleas of the Crown \*170 (hereinafter Hale) ("An indictment grounded upon an offense made by act of parliament must by express words bring the offense within the substantial description made in the act of parliament"). No Member of this Court questions the proposition that a State must charge in the indictment and prove at trial beyond a reasonable doubt the actual elements of the offense. This case, however, concerns the distinct question of when a fact that bears on a defendant's punishment, but which the legislature has not classified as an element of the charged offense, must nevertheless be treated as an offense element. The excerpts drawn from the Archbold treatise do not speak to this question at all. The history on which the Court's opinion relies provides no support for its "increase in the maximum penalty" rule.

In his concurring opinion, JUSTICE THOMAS cites additional historical evidence that, in his view, dictates an even broader rule than that set forth in the Court's opinion. The history cited by JUSTICE THOMAS does not require, as a matter of federal constitutional law, the application of the rule he advocates. To understand why, it is important to focus on the basis for JUSTICE THOMAS' argument. First, he claims that the Fifth and Sixth Amendments "codified" preexisting common law. Second, he contends that the relevant common law treated any fact that served to increase a defendant's punishment as an element of an offense. See *ante,* at 500–501. Even if JUSTICE THOMAS' first assertion were

correct—a proposition this Court has not before embraced—he fails to gather the evidence necessary to support his second assertion. Indeed, for an opinion that purports to be founded upon the original understanding of the Fifth and Sixth Amendments, JUSTICE THOMAS' concurrence is notable for its failure to discuss any historical practice, or to cite any decisions, predating (or contemporary with) the ratification of the Bill of Rights. Rather, JUSTICE THOMAS divines the common-law understanding of the Fifth and Sixth Amendment rights by consulting decisions rendered by American courts well after the ratification of the Bill of Rights, ranging primarily from the 1840's to the 1890's. Whatever those decisions might reveal about the way American state courts resolved questions regarding the distinction between a crime and its punishment under general rules of criminal pleading or their own state constitutions, the decisions fail to demonstrate any settled understanding with respect to the definition of a crime under the relevant, pre-existing common law. Thus, there is a crucial disconnect between the historical evidence JUSTICE THOMAS cites and the proposition he seeks to establish with that evidence.

An examination of the decisions cited by JUSTICE THOMAS makes clear that they did not involve a simple application of a long-settled common-law rule that any fact that increases punishment must constitute an offense element. That would have been unlikely, for there does not appear to have been any such common-law rule. The most relevant common-law principles in this area were that an indictment must charge the elements of the relevant offense and must do so with certainty. See, e. g., 2 Hale *182 ("Touching the thing wherein or of which the offense is committed, there is required a certainty in an indictment"); id., at *183 ("The fact itself must be certainly set down in an indictment"); id., at *184 ("The offense itself must be alledged, and the manner of it"). Those principles, of course, say little about when a specific fact constitutes an element of the offense.

JUSTICE THOMAS is correct to note that American courts in the 19th century came to confront this question in their cases, and often treated facts that served to increase punishment as elements of the relevant statutory offenses. To the extent JUSTICE THOMAS' broader rule can be drawn from those decisions, the rule was one of those courts' own invention, and not a previously existing rule that would have been "codified" by the ratification of the Fifth and Sixth Amendments. Few of the decisions cited by JUSTICE THOMAS indicate a reliance on pre-existing common-law principles. In fact, the converse rule that he identifies in the 19th-century American cases—that a fact that does not make a difference in punishment need not be charged in an indictment, see, e. g., Larned v. Commonwealth, 53 Mass. 240, 242–244 (1847)—was assuredly created by American courts, given that English courts of roughly the same period followed a contrary rule. See, e. g., Rex v. Marshall, 1 Moody C. C. 158, 168 Eng. Rep. 1224 (1827). JUSTICE THOMAS' collection of state-court opinions is therefore of marginal assistance in determining the original understanding of the Fifth and Sixth Amendments. While the decisions JUSTICE THOMAS cites provide some authority for the rule he advocates, they certainly do not control our resolution of the *federal constitutional* question presented in the instant case and cannot, standing alone, justify overruling three decades' worth of decisions by this Court.

In contrast to JUSTICE THOMAS, the Court asserts that its rule is supported by "our cases in this area." *Ante,* at 490. That the Court begins its review of our precedent with a quotation from a dissenting opinion speaks volumes about the support that actually can be drawn from our cases for the "increase in the maximum penalty" rule announced today. See *ante,* at 484 (quoting *Almendarez-Torres,* 523 U. S., at 251 (SCALIA, J., dissenting)). The Court then cites our decision in *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), to demonstrate the "lesson" that due process and jury protec-

tions extend beyond those factual determinations that affect a defendant's guilt or innocence. *Ante,* at 484. The Court explains *Mullaney* as having held that the due process proof-beyond-a-reasonable-doubt requirement applies to those factual determinations that, under a State's criminal law, make a difference in the degree of punishment the defendant receives. *Ante,* at 484. The Court chooses to ignore, however, the decision we issued two years later, *Patterson* v. *New York,* 432 U. S. 197 (1977), which clearly rejected the Court's broad reading of *Mullaney.*

In *Patterson,* the jury found the defendant guilty of second-degree murder. Under New York law, the fact that a person intentionally killed another while under the influence of extreme emotional disturbance distinguished the reduced offense of first-degree manslaughter from the more serious offense of second-degree murder. Thus, the presence or absence of this one fact was the defining factor separating a greater from a lesser punishment. Under New York law, however, the State did not need to prove the absence of extreme emotional disturbance beyond a reasonable doubt. Rather, state law imposed the burden of proving the presence of extreme emotional disturbance on the defendant, and required that the fact be proved by a preponderance of the evidence. 432 U. S., at 198–200. We rejected Patterson's due process challenge to his conviction:

> "We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused. Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch." *Id.,* at 210.

Although we characterized the factual determination under New York law as one going to the mitigation of culpability, *id.,* at 206, as opposed to the aggravation of the punishment, it is difficult to understand why the rule adopted by the Court in today's case (or the broader rule advocated by JUSTICE THOMAS) would not require the overruling of *Patterson.* Unless the Court is willing to defer to a legislature's formal definition of the elements of an offense, it is clear that the fact that Patterson did not act under the influence of extreme emotional disturbance, in substance, "increase[d] the penalty for [his] crime beyond the prescribed statutory maximum" for first-degree manslaughter. *Ante,* at 490. Nonetheless, we held that New York's requirement that the defendant, rather than the State, bear the burden of proof on this factual determination comported with the Fourteenth Amendment's Due Process Clause. *Patterson,* 432 U. S., at 205–211, 216; see also *id.,* at 204–205 (reaffirming *Leland* v. *Oregon,* 343 U. S. 790 (1952), which upheld against due process challenge Oregon's requirement that the defendant, rather than the State, bear the burden on factual determination of defendant's insanity).

*Patterson* is important because it plainly refutes the Court's expansive reading of *Mullaney.* Indeed, the defendant in *Patterson* characterized *Mullaney* exactly as the Court has today and we *rejected* that interpretation:

> "*Mullaney's* holding, it is argued, is that the State may not permit the blameworthiness of an act *or the severity of punishment authorized for its commission* to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt. In our view, the *Mullaney* holding should not be so broadly read." *Patterson, supra,* at 214–215 (emphasis added) (footnote omitted).

We explained *Mullaney* instead as holding only "that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense." 432 U. S., at 215. Because nothing had been presumed against Patterson under New York law, we found no due process violation. *Id.*, at 216. Ever since our decision in *Patterson*, we have consistently explained the holding in *Mullaney* in these limited terms and have rejected the broad interpretation the Court gives *Mullaney* today. See *Jones*, 526 U. S., at 241 ("We identified the use of a presumption to establish an essential ingredient of the offense as the curse of the Maine law [in *Mullaney*]"); *Almendarez-Torres*, 523 U. S., at 240 ("*[Mullaney]* suggests that Congress cannot permit judges to increase a sentence in light of recidivism, or any other factor, not set forth in an indictment and proved to a jury beyond a reasonable doubt. This Court's later case, *Patterson* v. *New York*, . . . however, makes absolutely clear that such a reading of *Mullaney* is wrong"); *McMillan*, 477 U. S., at 84 (same).

The case law from which the Court claims that its rule emerges consists of only one other decision—*McMillan* v. *Pennsylvania*. The Court's reliance on *McMillan* is also puzzling, given that our holding in that case points to the rejection of the Court's rule. There, we considered a Pennsylvania statute that subjected a defendant to a mandatory minimum sentence of five years' imprisonment if a judge found, by a preponderance of the evidence, that the defendant had visibly possessed a firearm during the commission of the offense for which he had been convicted. *Id.*, at 81. The petitioners claimed that the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's jury trial guarantee (as incorporated by the Fourteenth Amendment) required the State to prove to the jury beyond a reasonable

doubt that they had visibly possessed firearms. We rejected both constitutional claims. *Id.*, at 84–91, 93.

The essential holding of *McMillan* conflicts with at least two of the several formulations the Court gives to the rule it announces today. First, the Court endorses the following principle: "'[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts *that increase the prescribed range of penalties* to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.'" *Ante*, at 490 (emphasis added) (quoting *Jones, supra*, at 252–253 (STEVENS, J., concurring)). Second, the Court endorses the rule as restated in JUSTICE SCALIA's concurring opinion in *Jones*. See *ante*, at 490. There, JUSTICE SCALIA wrote: "[I]t is unconstitutional to remove from the jury the assessment of facts *that alter the congressionally prescribed range of penalties* to which a criminal defendant is exposed." *Jones, supra*, at 253 (emphasis added). Thus, the Court appears to hold that any fact that increases or alters *the range* of penalties to which a defendant is exposed—which, by definition, must include increases or alterations to either the minimum or maximum penalties—must be proved to a jury beyond a reasonable doubt. In *McMillan*, however, we rejected such a rule to the extent it concerned those facts that increase or alter the minimum penalty to which a defendant is exposed. Accordingly, it is incumbent on the Court not only to admit that it is overruling *McMillan*, but also to explain why such a course of action is appropriate under normal principles of *stare decisis*.

The Court's opinion does neither. Instead, it attempts to lay claim to *McMillan* as support for its "increase in the maximum penalty" rule. According to the Court, *McMillan* acknowledged that permitting a judge to make findings that expose a defendant to greater or additional punishment "may raise serious constitutional concern." *Ante*, at 486. We said nothing of the sort in *McMillan*. To the contrary, we

began our discussion of the petitioners' constitutional claims by emphasizing that we had already "rejected the claim that whenever a State links the 'severity of punishment' to 'the presence or absence of an identified fact' the State must prove that fact beyond a reasonable doubt." 477 U. S., at 84 (quoting *Patterson,* 432 U. S., at 214). We then reaffirmed the rule set forth in *Patterson*—"that in determining what facts must be proved beyond a reasonable doubt the state legislature's definition of the elements of the offense is usually dispositive." *McMillan,* 477 U. S., at 85. Although we acknowledged that there are constitutional limits to the State's power to define crimes and prescribe penalties, we found no need to establish those outer boundaries in *McMillan* because "several factors" persuaded us that the Pennsylvania statute did not exceed those limits, however those limits might be defined. *Id.,* at 86. The Court's assertion that *McMillan* supports the application of its bright-line rule in this area is, therefore, unfounded.

The Court nevertheless claims to find support for its rule in our discussion of one factor in *McMillan*—namely, our statement that the petitioners' claim would have had "at least more superficial appeal" if the firearm possession finding had exposed them to greater or additional punishment. *Id.,* at 88. To say that a claim may have had "more superficial appeal" is, of course, a far cry from saying that a claim would have been upheld. Moreover, we made that statement in the context of examining one of several factors that, in combination, ultimately gave "no doubt that Pennsylvania's [statute fell] on the permissible side of the constitutional line." *Id.,* at 91. The confidence of that conclusion belies any argument that our ruling would have been different had the Pennsylvania statute instead increased the maximum penalty to which the petitioners were exposed. In short, it is clear that we did not articulate any bright-line rule that States must prove to a jury beyond a reasonable doubt any fact that exposes a defendant to a greater punishment.

Such a rule would have been in substantial tension with both our earlier acknowledgment that *Patterson* rejected such a rule, see 477 U. S., at 84, and our recognition that a state legislature's definition of the elements is normally dispositive, see *id.*, at 85. If any single rule can be derived from *McMillan*, it is not the Court's "increase in the maximum penalty" principle, but rather the following: When a State takes a fact that has always been considered by sentencing courts to bear on punishment, and dictates the precise weight that a court should give that fact in setting a defendant's sentence, the relevant fact need not be proved to a jury beyond a reasonable doubt as would an element of the offense. See *id.*, at 89–90.

Apart from *Mullaney* and *McMillan*, the Court does not claim to find support for its rule in any other pre-*Jones* decision. Thus, the Court is in error when it says that its rule emerges from our case law. Nevertheless, even if one were willing to assume that *Mullaney* and *McMillan* lend some support for the Court's position, that feeble foundation is shattered by several of our precedents directly addressing the issue. The only one of those decisions that the Court addresses at any length is *Almendarez-Torres*. There, we squarely rejected the "increase in the maximum penalty" rule: "Petitioner also argues, in essence, that this Court should simply adopt a rule that any significant increase in a statutory maximum sentence would trigger a constitutional 'elements' requirement. We have explained why we believe the Constitution, as interpreted in *McMillan* and earlier cases, does not impose that requirement." 523 U. S., at 247. Whether *Almendarez-Torres* directly refuted the "increase in the maximum penalty" rule was extensively debated in *Jones*, and that debate need not be repeated here. See 526 U. S., at 248–249; *id.*, at 268–270 (KENNEDY, J., dissenting). I continue to agree with JUSTICE KENNEDY that *Almendarez-Torres* constituted a clear repudiation of the rule the Court adopts today. See *Jones, supra*, at 268 (dis-

senting opinion). My understanding is bolstered by *Monge* v. *California,* a decision relegated to a footnote by the Court today. In *Monge,* in reasoning essential to our holding, we reiterated that "the Court has rejected an absolute rule that an enhancement constitutes an element of the offense any time that it increases the maximum sentence to which a defendant is exposed." 524 U. S., at 729 (citing *Almendarez-Torres*). At the very least, *Monge* demonstrates that *Almendarez-Torres* was not an "exceptional departure" from "historic practice." *Ante,* at 487.

Of all the decisions that refute the Court's "increase in the maximum penalty" rule, perhaps none is as important as *Walton* v. *Arizona,* 497 U. S. 639 (1990). There, a jury found Walton, the petitioner, guilty of first-degree murder. Under Arizona law, a trial court conducts a separate sentencing hearing to determine whether a defendant convicted of first-degree murder should receive the death penalty or life imprisonment. See *id.,* at 643 (citing Ariz. Rev. Stat. Ann. § 13–703(B) (1989)). At that sentencing hearing, the judge, rather than the jury, must determine the existence or non-existence of the statutory aggravating and mitigating factors. See *Walton,* 497 U. S., at 643 (quoting § 13–703(B)). The Arizona statute directs the judge to "'impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in [the statute] and that there are no mitigating circumstances sufficiently substantial to call for leniency.'" *Id.,* at 644 (quoting § 13–703(E)). Thus, under Arizona law, a defendant convicted of first-degree murder can be sentenced to death *only if* the judge finds the existence of a statutory aggravating factor.

Walton challenged the Arizona capital sentencing scheme, arguing that the Constitution requires that the jury, and not the judge, make the factual determination of the existence or nonexistence of the statutory aggravating factors. We rejected that contention: "'Any argument that the Constitution requires that a jury impose the sentence of death or

make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court.'" *Id.*, at 647 (quoting *Clemons* v. *Mississippi*, 494 U. S. 738, 745 (1990)). Relying in part on our decisions rejecting challenges to Florida's capital sentencing scheme, which also provided for sentencing by the trial judge, we added that "'the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.'" *Walton, supra,* at 648 (quoting *Hildwin* v. *Florida,* 490 U. S. 638, 640–641 (1989) *(per curiam)*).

While the Court can cite no decision that would require its "increase in the maximum penalty" rule, *Walton* plainly rejects it. Under Arizona law, the fact that a statutory aggravating circumstance exists in the defendant's case "'increases the maximum penalty for [the] crime'" of first-degree murder to death. *Ante,* at 476 (quoting *Jones, supra,* at 243, n. 6). If the judge does not find the existence of a statutory aggravating circumstance, the maximum punishment authorized by the jury's guilty verdict is life imprisonment. Thus, using the terminology that the Court itself employs to describe the constitutional fault in the New Jersey sentencing scheme presented here, under Arizona law, the judge's finding that a statutory aggravating circumstance exists "exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ante,* at 483 (emphasis in original). Even JUSTICE THOMAS, whose vote is necessary to the Court's opinion today, agrees on this point. See *ante,* at 522 (concurring opinion). If a State can remove from the jury a factual determination that makes the difference between life and death, as *Walton* holds that it can, it is inconceivable why a State cannot do the same with respect to a factual determination that results in only a 10-year increase in the maximum sentence to which a defendant is exposed.

The distinction of *Walton* offered by the Court today is baffling, to say the least. The key to that distinction is the Court's claim that, in Arizona, the jury makes all of the findings necessary to expose the defendant to a death sentence. See *ante*, at 496–497 (quoting *Almendarez-Torres*, 523 U. S., at 257, n. 2 (SCALIA, J., dissenting)). As explained above, that claim is demonstrably untrue. A defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty. Indeed, at the time *Walton* was decided, the author of the Court's opinion today understood well the issue at stake. See *Walton*, 497 U. S., at 709 (STEVENS, J., dissenting) ("[U]nder Arizona law, as construed by Arizona's highest court, a first-degree murder is not punishable by a death sentence until at least one statutory aggravating circumstance has been proved"). In any event, the extent of our holding in *Walton* should have been perfectly obvious from the face of our decision. We upheld the Arizona scheme specifically on the ground that the Constitution does not require the jury to make the factual findings that serve as the "'prerequisite to imposition of [a death] sentence,'" *id.*, at 647 (quoting *Clemons, supra*, at 745), or "'the specific findings authorizing the imposition of the sentence of death,'" *Walton, supra*, at 648 (quoting *Hildwin, supra*, at 640–641). If the Court does not intend to overrule *Walton*, one would be hard pressed to tell from the opinion it issues today.

The distinction of *Walton* offered by JUSTICE THOMAS is equally difficult to comprehend. According to JUSTICE THOMAS, because the Constitution requires state legislatures to narrow sentencing discretion in the capital punishment context, facts that expose a convicted defendant to a capital sentence may be different from all other facts that expose a defendant to a more severe sentence. See *ante*, at 522–523.

JUSTICE THOMAS gives no specific reason for excepting capital defendants from the constitutional protections he would extend to defendants generally, and none is readily apparent. If JUSTICE THOMAS means to say that the Eighth Amendment's restriction on a state legislature's ability to define capital crimes should be compensated for by permitting States more leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence, his reasoning is without precedent in our constitutional jurisprudence.

In sum, the Court's statement that its "increase in the maximum penalty" rule emerges from the history and case law that it cites is simply incorrect. To make such a claim, the Court finds it necessary to rely on irrelevant historical evidence, to ignore our controlling precedent (e. g., *Patterson*), and to offer unprincipled and inexplicable distinctions between its decision and previous cases addressing the same subject in the capital sentencing context (e. g., *Walton*). The Court has failed to offer any meaningful justification for deviating from years of cases both suggesting and holding that application of the "increase in the maximum penalty" rule is not required by the Constitution.

## II

That the Court's rule is unsupported by the history and case law it cites is reason enough to reject such a substantial departure from our settled jurisprudence. Significantly, the Court also fails to explain adequately why the Due Process Clauses of the Fifth and Fourteenth Amendments and the jury trial guarantee of the Sixth Amendment require application of its rule. Upon closer examination, it is possible that the Court's "increase in the maximum penalty" rule rests on a meaningless formalism that accords, at best, marginal protection for the constitutional rights that it seeks to effectuate.

Any discussion of either the constitutional necessity or the likely effect of the Court's rule must begin, of course, with an understanding of what exactly that rule is. As was the case in *Jones*, however, that discussion is complicated here by the Court's failure to clarify the contours of the constitutional principle underlying its decision. See *Jones*, 526 U. S., at 267 (KENNEDY, J., dissenting). In fact, there appear to be several plausible interpretations of the constitutional principle on which the Court's decision rests.

For example, under one reading, the Court appears to hold that the Constitution requires that a fact be submitted to a jury and proved beyond a reasonable doubt only if that fact, as a formal matter, extends the range of punishment *beyond the prescribed statutory maximum*. See, *e. g., ante*, at 490. A State could, however, remove from the jury (and subject to a standard of proof below "beyond a reasonable doubt") the assessment of those facts that define narrower ranges of punishment, *within the overall statutory range*, to which the defendant may be sentenced. See, *e. g., ante*, at 494, n. 19. Thus, apparently New Jersey could cure its sentencing scheme, and achieve virtually the same results, by drafting its weapons possession statute in the following manner: First, New Jersey could prescribe, in the weapons possession statute itself, a range of 5 to 20 years' imprisonment for one who commits that criminal offense. Second, New Jersey could provide that only those defendants convicted under the statute who are found by a judge, by a preponderance of the evidence, to have acted with a purpose to intimidate an individual on the basis of race may receive a sentence greater than 10 years' imprisonment.

The Court's proffered distinction of *Walton* v. *Arizona* suggests that it means to announce a rule of only this limited effect. The Court claims the Arizona capital sentencing scheme is consistent with the constitutional principle underlying today's decision because Arizona's first-degree murder statute itself authorizes both life imprisonment and

the death penalty. See Ariz. Rev. Stat. Ann. § 13–1105(C) (1989). "'[O]nce a *jury* has found the defendant *guilty* of *all the elements* of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed.'" *Ante*, at 497 (emphasis in original) (quoting *Almendarez-Torres*, 523 U. S., at 257, n. 2 (SCALIA, J., dissenting)). Of course, as explained above, an Arizona sentencing judge can impose the maximum penalty of death only if the judge first makes a statutorily required finding that at least one aggravating factor exists in the defendant's case. Thus, the Arizona first-degree murder statute authorizes a maximum penalty of death only in a formal sense. In real terms, however, the Arizona sentencing scheme removes from the jury the assessment of a fact that determines whether the defendant can receive that maximum punishment. The only difference, then, between the Arizona scheme and the New Jersey scheme we consider here—apart from the magnitude of punishment at stake—is that New Jersey has not prescribed the 20-year maximum penalty in the same statute that it defines the crime to be punished. It is difficult to understand, and the Court does not explain, why the Constitution would require a state legislature to follow such a meaningless and formalistic difference in drafting its criminal statutes.

Under another reading of the Court's decision, it may mean only that the Constitution requires that a fact be submitted to a jury and proved beyond a reasonable doubt if it, as a formal matter, *increases* the range of punishment *beyond that which could legally be imposed absent that fact.* See, *e. g., ante*, at 482–483, 490. A State could, however, remove from the jury (and subject to a standard of proof below "beyond a reasonable doubt") the assessment of those facts that, as a formal matter, *decrease* the range of punishment *below that which could legally be imposed absent that fact.* Thus, consistent with our decision in *Patterson*, New

Jersey could cure its sentencing scheme, and achieve virtually the same results, by drafting its weapons possession statute in the following manner: First, New Jersey could prescribe, in the weapons possession statute itself, a range of 5 to 20 years' imprisonment for one who commits that criminal offense. Second, New Jersey could provide that a defendant convicted under the statute whom a judge finds, by a preponderance of the evidence, *not* to have acted with a purpose to intimidate an individual on the basis of race may receive a sentence no greater than 10 years' imprisonment.

The rule that JUSTICE THOMAS advocates in his concurring opinion embraces this precise distinction between a fact that increases punishment and a fact that decreases punishment. See *ante*, at 501 ("[A] 'crime' includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment)"). The historical evidence on which JUSTICE THOMAS relies, however, demonstrates both the difficulty and the pure formalism of making a constitutional "elements" rule turn on such a difference. For example, the Wisconsin statute considered in *Lacy* v. *State*, 15 Wis. *13 (1862), could plausibly qualify as either increasing or mitigating punishment on the basis of the same specified fact. There, Wisconsin provided that the willful and malicious burning of a dwelling house in which "the life of no person shall have been destroyed" was punishable by 7 to 14 years in prison, but that the same burning at a time in which "there was no person lawfully in the dwelling house" was punishable by only 3 to 10 years in prison. Wis. Rev. Stat., ch. 165, § 1 (1858). Although the statute appeared to make the *absence* of persons from the affected dwelling house a fact that mitigated punishment, the Wisconsin Supreme Court found that the *presence* of a person in the affected house constituted an aggravating circumstance. *Lacy*, *supra*, at *15–*16. As both this example and the above hypothetical redrafted New Jersey statute demonstrate, see *supra*, at 540, whether a fact is responsible for an

increase or a decrease in punishment rests in the eye of the beholder. Again, it is difficult to understand, and neither the Court nor JUSTICE THOMAS explains, why the Constitution would require a state legislature to follow such a meaningless and formalistic difference in drafting its criminal statutes.

If either of the above readings is all that the Court's decision means, "the Court's principle amounts to nothing more than chastising [the New Jersey Legislature] for failing to use the approved phrasing in expressing its intent as to how [unlawful weapons possession] should be punished." *Jones,* 526 U. S., at 267 (KENNEDY, J., dissenting). If New Jersey can, consistent with the Constitution, make precisely the same differences in punishment turn on precisely the same facts, and can remove the assessment of those facts from the jury and subject them to a standard of proof below "beyond a reasonable doubt," it is impossible to say that the Fifth, Sixth, and Fourteenth Amendments require the Court's rule. For the same reason, the "structural democratic constraints" that might discourage a legislature from enacting either of the above hypothetical statutes would be no more significant than those that would discourage the enactment of New Jersey's present sentence-enhancement statute. See *ante,* at 490–491, n. 16 (majority opinion). In all three cases, the legislature is able to calibrate punishment perfectly, and subject to a maximum penalty only those defendants whose cases satisfy the sentence-enhancement criterion. As JUSTICE KENNEDY explained in *Jones,* "[n]o constitutional values are served by so formalistic an approach, while its constitutional costs in statutes struck down ... are real." 526 U. S., at 267.

Given the pure formalism of the above readings of the Court's opinion, one suspects that the constitutional principle underlying its decision is more far reaching. The actual principle underlying the Court's decision may be that any fact (other than prior conviction) that has the effect, *in real terms,* of increasing the maximum punishment beyond an

otherwise applicable range must be submitted to a jury and proved beyond a reasonable doubt. See, *e. g., ante,* at 494 ("[T]he relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"). The principle thus would apply not only to schemes like New Jersey's, under which a factual determination exposes the defendant to a sentence beyond the prescribed statutory maximum, but also to all determinate-sentencing schemes in which the length of a defendant's sentence within the statutory range turns on specific factual determinations (*e. g.,* the federal Sentencing Guidelines). JUSTICE THOMAS essentially concedes that the rule outlined in his concurring opinion would require the invalidation of the Sentencing Guidelines. See *ante,* at 523, n. 11.

I would reject any such principle. As explained above, it is inconsistent with our precedent and would require the Court to overrule, at a minimum, decisions like *Patterson* and *Walton.* More importantly, given our approval of—and the significant history in this country of—discretionary sentencing by judges, it is difficult to understand how the Fifth, Sixth, and Fourteenth Amendments could possibly require the Court's or JUSTICE THOMAS' rule. Finally, in light of the adoption of determinate-sentencing schemes by many States and the Federal Government, the consequences of the Court's and JUSTICE THOMAS' rules in terms of sentencing schemes invalidated by today's decision will likely be severe.

As the Court acknowledges, we have never doubted that the Constitution permits Congress and the state legislatures to define criminal offenses, to prescribe broad ranges of punishment for those offenses, and to give judges discretion to decide where within those ranges a particular defendant's punishment should be set. See *ante,* at 481–482. That view accords with historical practice under the Constitution. "From the beginning of the Republic, federal judges were entrusted with wide sentencing discretion. The great

majority of federal criminal statutes have stated only a maximum term of years and a maximum monetary fine, permitting the sentencing judge to impose any term of imprisonment and any fine up to the statutory maximum." K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998) (footnote omitted). Under discretionary-sentencing schemes, a judge bases the defendant's sentence on any number of facts neither presented at trial nor found by a jury beyond a reasonable doubt. As one commentator has explained:

"During the age of broad judicial sentencing discretion, judges frequently made sentencing decisions on the basis of facts that they determined for themselves, on less than proof beyond a reasonable doubt, without eliciting very much concern from civil libertarians. . . . The sentence in any number of traditional discretionary situations depended quite directly on judicial findings of specific contested facts. . . . Whether because such facts were directly relevant to the judge's retributionist assessment of how serious the particular offense was (within the spectrum of conduct covered by the statute of conviction), or because they bore on a determination of how much rehabilitation the offender's character was likely to need, the sentence would be higher or lower, in some specific degree determined by the judge, based on the judge's factual conclusions." Lynch, Towards A Model Penal Code, Second (Federal?), 2 Buffalo Crim. L. Rev. 297, 320 (1998) (footnote omitted).

Accordingly, under the discretionary-sentencing schemes, a factual determination made by a judge on a standard of proof below "beyond a reasonable doubt" often made the difference between a lesser and a greater punishment.

For example, in *Williams* v. *New York*, a jury found the defendant guilty of first-degree murder and recommended life imprisonment. The judge, however, rejected the jury's

recommendation and sentenced Williams to death on the basis of additional facts that he learned through a presentence investigation report and that had neither been charged in an indictment nor presented to the jury. 337 U. S., at 242–245. In rejecting Williams' due process challenge to his death sentence, we explained that there was a long history of sentencing judges exercising "wide discretion in the sources and types of evidence used to assist [them] in determining the kind and extent of punishment to be imposed within limits fixed by law." *Id.*, at 246. Specifically, we held that the Constitution does not restrict a judge's sentencing decision to information that is charged in an indictment and subject to cross-examination in open court. "The due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure." *Id.*, at 251.

Under our precedent, then, a State may leave the determination of a defendant's sentence to a judge's discretionary decision within a prescribed range of penalties. When a judge, pursuant to that sentencing scheme, decides to increase a defendant's sentence on the basis of certain contested facts, those facts need not be proved to a jury beyond a reasonable doubt. The judge's findings, whether by proof beyond a reasonable doubt or less, suffice for purposes of the Constitution. Under the Court's decision today, however, it appears that once a legislature constrains judges' sentencing discretion by prescribing certain sentences that may only be imposed (or must be imposed) in connection with the same determinations of the same contested facts, the Constitution requires that the facts instead be proved to a jury beyond a reasonable doubt. I see no reason to treat the two schemes differently. See, *e. g., McMillan*, 477 U. S., at 92 ("We have some difficulty fathoming why the due process calculus would change simply because the legislature has seen fit to provide sentencing courts with additional guidance"). In this respect, I agree with the Solicitor General that "[a] sen-

tence that is constitutionally permissible when selected by a court on the basis of whatever factors it deems appropriate does not become impermissible simply because the court is permitted to select that sentence only after making a finding prescribed by the legislature." Brief for United States as *Amicus Curiae* 7. Although the Court acknowledges the legitimacy of discretionary sentencing by judges, see *ante*, at 481–482, it never provides a sound reason for treating judicial factfinding under determinate-sentencing schemes differently under the Constitution.

JUSTICE THOMAS' attempt to explain this distinction is similarly unsatisfying. His explanation consists primarily of a quotation, in turn, of a 19th-century treatise writer, who contended that the aggravation of punishment within a statutory range on the basis of facts found by a judge "'is an entirely different thing from punishing one for what is not alleged against him.'" *Ante*, at 519 (quoting 1 J. Bishop, Commentaries on Law of Criminal Procedure §85, p. 54 (rev. 2d ed. 1872)). As our decision in *Williams* v. *New York* demonstrates, however, that statement does not accurately describe the reality of discretionary sentencing conducted by judges. A defendant's actual punishment can be affected in a very real way by facts never alleged in an indictment, never presented to a jury, and never proved beyond a reasonable doubt. In Williams' case, facts presented for the first time to the judge, for purposes of sentencing alone, made the difference between life imprisonment and a death sentence.

Consideration of the purposes underlying the Sixth Amendment's jury trial guarantee further demonstrates why our acceptance of judge-made findings in the context of discretionary sentencing suggests the approval of the same judge-made findings in the context of determinate sentencing as well. One important purpose of the Sixth Amendment's jury trial guarantee is to protect the criminal defendant against potentially arbitrary judges. It effectuates this promise by preserving, as a constitutional matter, certain

fundamental decisions for a jury of one's peers, as opposed to a judge. For example, the Court has recognized that the Sixth Amendment's guarantee was motivated by the English experience of "competition . . . between judge and jury over the real significance of their respective roles," *Jones,* 526 U. S., at 245, and "measures [that were taken] to diminish the juries' power," *ibid.* We have also explained that the jury trial guarantee was understood to provide "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it." *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968). Blackstone explained that the right to trial by jury was critically important in criminal cases because of "the violence and partiality of judges appointed by the crown, . . . who might then, as in France or Turkey, imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration, that such is their will and pleasure." 4 Blackstone, Commentaries, at 343. Clearly, the concerns animating the Sixth Amendment's jury trial guarantee, if they were to extend to the sentencing context at all, would apply with greater strength to a discretionary-sentencing scheme than to determinate sentencing. In the former scheme, the potential for mischief by an arbitrary judge is much greater, given that the judge's decision of where to set the defendant's sentence within the prescribed statutory range is left almost entirely to discretion. In contrast, under a determinate-sentencing system, the discretion the judge wields within the statutory range is tightly constrained. Accordingly, our approval of discretionary-sentencing schemes, in which a defendant is not entitled to have a jury make factual findings relevant to sentencing despite the effect those findings have on the severity of the defendant's sentence, demonstrates that the defendant should have no right to demand that a jury make

the equivalent factual determinations under a determinate-sentencing scheme.

The Court appears to hold today, however, that a defendant is entitled to have a jury decide, by proof beyond a reasonable doubt, every fact relevant to the determination of sentence under a determinate-sentencing scheme. If this is an accurate description of the constitutional principle underlying the Court's opinion, its decision will have the effect of invalidating significant sentencing reform accomplished at the federal and state levels over the past three decades. JUSTICE THOMAS' rule, as he essentially concedes, see *ante*, at 523, n. 11, would have the same effect.

Prior to the most recent wave of sentencing reform, the Federal Government and the States employed indeterminate-sentencing schemes in which judges and executive branch officials (*e. g.*, parole board officials) had substantial discretion to determine the actual length of a defendant's sentence. See, *e. g.*, U. S. Dept. of Justice, S. Shane-DuBow, A. Brown, & E. Olsen, Sentencing Reform in the United States: History, Content, and Effect 6–7 (Aug. 1985) (hereinafter Shane-DuBow); Report of Twentieth Century Fund Task Force on Criminal Sentencing, Fair and Certain Punishment 11–13 (1976) (hereinafter Task Force Report); A. Dershowitz, Criminal Sentencing in the United States: An Historical and Conceptual Overview, 423 Annals Am. Acad. Pol. & Soc. Sci. 117, 128–129 (1976). Studies of indeterminate-sentencing schemes found that similarly situated defendants often received widely disparate sentences. See, *e. g.*, Shane-Dubow 7; Task Force Report 14. Although indeterminate sentencing was intended to soften the harsh and uniform sentences formerly imposed under mandatory-sentencing systems, some studies revealed that indeterminate sentencing actually had the opposite effect. See, *e. g.*, A. Campbell, Law of Sentencing 13 (1978) ("Paradoxically the humanitarian impulse sparking the adoption of indeterminate sentencing systems in this country has resulted in

an actual increase of the average criminal's incarceration term"); Task Force Report 13 ("[T]he data seem to indicate that in those jurisdictions where the sentencing structure is more indeterminate, judicially imposed sentences tend to be longer").

In response, Congress and the state legislatures shifted to determinate-sentencing schemes that aimed to limit judges' sentencing discretion and, thereby, afford similarly situated offenders equivalent treatment. See, e. g., Cal. Penal Code Ann. § 1170 (West Supp. 2000). The most well known of these reforms was the federal Sentencing Reform Act of 1984, 18 U. S. C. § 3551 et seq. In the Act, Congress created the United States Sentencing Commission, which in turn promulgated the Sentencing Guidelines that now govern sentencing by federal judges. See, e. g., United States Sentencing Commission, Guidelines Manual (Nov. 1998). Whether one believes the determinate-sentencing reforms have proved successful or not—and the subject is one of extensive debate among commentators—the apparent effect of the Court's opinion today is to halt the current debate on sentencing reform in its tracks and to invalidate with the stroke of a pen three decades' worth of nationwide reform, all in the name of a principle with a questionable constitutional pedigree. Indeed, it is ironic that the Court, in the name of constitutional rights meant to protect criminal defendants from the potentially arbitrary exercise of power by prosecutors and judges, appears to rest its decision on a principle that would render unconstitutional efforts by Congress and the state legislatures to place constraints on that very power in the sentencing context.

Finally, perhaps the most significant impact of the Court's decision will be a practical one—its unsettling effect on sentencing conducted under current federal and state determinate-sentencing schemes. As I have explained, the Court does not say whether these schemes are constitutional,

but its reasoning strongly suggests that they are not. Thus, with respect to past sentences handed down by judges under determinate-sentencing schemes, the Court's decision threatens to unleash a flood of petitions by convicted defendants seeking to invalidate their sentences in whole or in part on the authority of the Court's decision today. Statistics compiled by the United States Sentencing Commission reveal that almost a half-million cases have been sentenced under the Sentencing Guidelines since 1989. See Memorandum from U. S. Sentencing Commission to Supreme Court Library, dated June 8, 2000 (total number of cases sentenced under federal Sentencing Guidelines since 1989) (available in Clerk of Court's case file). Federal cases constitute only the tip of the iceberg. In 1998, for example, federal criminal prosecutions represented only about 0.4% of the total number of criminal prosecutions in federal and state courts. See National Center for State Courts, A National Perspective: Court Statistics Project (federal and state court filings, 1998), http://www.ncsc.dni.us/divisions/research/csp/csp98-fscf.html (showing that, in 1998, 57,691 criminal cases were filed in federal court compared to 14,623,330 in state courts) (available in Clerk of Court's case file). Because many States, like New Jersey, have determinate-sentencing schemes, the number of individual sentences drawn into question by the Court's decision could be colossal.

The decision will likely have an even more damaging effect on sentencing conducted in the immediate future under current determinate-sentencing schemes. Because the Court fails to clarify the precise contours of the constitutional principle underlying its decision, federal and state judges are left in a state of limbo. Should they continue to assume the constitutionality of the determinate-sentencing schemes under which they have operated for so long, and proceed to sentence convicted defendants in accord with those governing statutes and guidelines? The Court provides no answer,

yet its reasoning suggests that each new sentence will rest on shaky ground. The most unfortunate aspect of today's decision is that our precedents did not foreordain this disruption in the world of sentencing. Rather, our cases traditionally took a cautious approach to questions like the one presented in this case. The Court throws that caution to the wind and, in the process, threatens to cast sentencing in the United States into what will likely prove to be a lengthy period of considerable confusion.

## III

Because I do not believe that the Court's "increase in the maximum penalty" rule is required by the Constitution, I would evaluate New Jersey's sentence-enhancement statute, N. J. Stat. Ann. § 2C:44-3 (West Supp. 2000), by analyzing the factors we have examined in past cases. See, *e. g.*, *Almendarez-Torres*, 523 U. S., at 242–243; *McMillan*, 477 U. S., at 86–90. First, the New Jersey statute does not shift the burden of proof on an essential ingredient of the offense by presuming that ingredient upon proof of other elements of the offense. See, *e. g., id.*, at 86–87; *Patterson*, 432 U. S., at 215. Second, the magnitude of the New Jersey sentence enhancement, as applied in petitioner's case, is constitutionally permissible. Under New Jersey law, the weapons possession offense to which petitioner pleaded guilty carries a sentence range of 5 to 10 years' imprisonment. N. J. Stat. Ann. §§ 2C:39-4(a), 2C:43-6(a)(2) (West 1995). The fact that petitioner, in committing that offense, acted with a purpose to intimidate because of race exposed him to a higher sentence range of 10 to 20 years' imprisonment. § 2C:43-7(a)(3). The 10-year increase in the maximum penalty to which petitioner was exposed falls well within the range we have found permissible. See *Almendarez-Torres, supra,* at 226, 242–243 (approving 18-year enhancement). Third, the New Jersey statute gives no impression of having been

enacted to evade the constitutional requirements that attach when a State makes a fact an element of the charged offense. For example, New Jersey did not take what had previously been an element of the weapons possession offense and transform it into a sentencing factor. See *McMillan,* 477 U. S., at 89.

In sum, New Jersey "simply took one factor that has always been considered by sentencing courts to bear on punishment"—a defendant's motive for committing the criminal offense—"and dictated the precise weight to be given that factor" when the motive is to intimidate a person because of race. *Id.,* at 89–90. The Court claims that a purpose to intimidate on account of race is a traditional *mens rea* element, and not a motive. See *ante,* at 492–493. To make this claim, the Court finds it necessary once again to ignore our settled precedent. In *Wisconsin* v. *Mitchell,* 508 U. S. 476 (1993), we considered a statute similar to the one at issue here. The Wisconsin statute provided for an increase in a convicted defendant's punishment if the defendant intentionally selected the victim of the crime because of that victim's race. *Id.,* at 480. In a unanimous decision upholding the statute, we specifically characterized it as providing a sentence enhancement based on the "motive" of the defendant. See *id.,* at 485 (distinguishing between punishment of defendant's "criminal conduct" and penalty enhancement "for conduct *motivated* by a discriminatory point of view" (emphasis added)); *id.,* at 484–485 ("[U]nder the Wisconsin statute the same criminal conduct may be more heavily punished if the victim is selected because of his race . . . than if no such *motive* obtained" (emphasis added)). That same characterization applies in the case of the New Jersey statute. As we also explained in *Mitchell,* the motive for committing an offense has traditionally been an important factor in determining a defendant's sentence. *Id.,* at 485. New Jersey, therefore, has done no more than what we held permissible

in *McMillan;* it has taken a traditional sentencing factor and dictated the precise weight judges should attach to that factor when the specific motive is to intimidate on the basis of race.

The New Jersey statute resembles the Pennsylvania statute we upheld in *McMillan* in every respect but one. That difference—that the New Jersey statute increases the maximum punishment to which petitioner was exposed—does not persuade me that New Jersey "sought to evade the constitutional requirements associated with the characterization of a fact as an offense element." *Supra,* at 524. There is no question that New Jersey could prescribe a range of 5 to 20 years' imprisonment as punishment for its weapons possession offense. Thus, as explained above, the specific means by which the State chooses to control judges' discretion within that permissible range is of no moment. Cf. *Patterson, supra,* at 207–208 ("The Due Process Clause, as we see it, does not put New York to the choice of abandoning [the affirmative defense] or undertaking to disprove [its] existence in order to convict of a crime which otherwise is within its constitutional powers to sanction by substantial punishment"). The New Jersey statute also resembles in virtually every respect the federal statute we considered in *Almendarez-Torres.* That the New Jersey statute provides an enhancement based on the defendant's motive while the statute in *Almendarez-Torres* provided an enhancement based on the defendant's commission of a prior felony is a difference without constitutional importance. Both factors are traditional bases for increasing an offender's sentence and, therefore, may serve as the grounds for a sentence enhancement.

On the basis of our prior precedent, then, I would hold that the New Jersey sentence-enhancement statute is constitutional, and affirm the judgment of the Supreme Court of New Jersey.

JUSTICE BREYER, with whom THE CHIEF JUSTICE joins, dissenting.

The majority holds that the Constitution contains the following requirement: "[A]ny fact [other than recidivism] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Ante*, at 490. This rule would seem to promote a procedural ideal—that of juries, not judges, determining the existence of those facts upon which increased punishment turns. But the real world of criminal justice cannot hope to meet any such ideal. It can function only with the help of procedural compromises, particularly in respect to sentencing. And those compromises, which are themselves necessary for the fair functioning of the criminal justice system, preclude implementation of the procedural model that today's decision reflects. At the very least, the impractical nature of the requirement that the majority now recognizes supports the proposition that the Constitution was not intended to embody it.

I

In modern times, the law has left it to the sentencing judge to find those facts which (within broad sentencing limits set by the legislature) determine the sentence of a convicted offender. The judge's factfinding role is not inevitable. One could imagine, for example, a pure "charge offense" sentencing system in which the degree of punishment depended only upon the crime charged (*e. g.*, eight mandatory years for robbery, six for arson, three for assault). But such a system would ignore many harms and risks of harm that the offender caused or created, and it would ignore many relevant offender characteristics. See United States Sentencing Commission, Sentencing Guidelines and Policy Statements, Part A, at 1.5 (1987) (hereinafter Sentencing Guidelines or Guidelines) (pointing out that a "charge offense"

system by definition would ignore any fact "that did not constitute [a] statutory elemen[t] of the offens[e] of which the defendant was convicted"). Hence, that imaginary "charge offense" system would not be a fair system, for it would lack proportionality, *i. e.*, it would treat different offenders similarly despite major differences in the manner in which each committed the same crime.

There are many such manner-related differences in respect to criminal behavior. Empirical data collected by the Sentencing Commission make clear that, before the Guidelines, judges who exercised discretion within broad legislatively determined sentencing limits (say, a range of 0 to 20 years) would impose very different sentences upon offenders engaged in the same basic criminal conduct, depending, for example, upon the amount of drugs distributed (in respect to drug crimes), the amount of money taken (in respect to robbery, theft, or fraud), the presence or use of a weapon, injury to a victim, the vulnerability of a victim, the offender's role in the offense, recidivism, and many other offense-related or offender-related factors. See United States Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 35–39 (1987) (hereinafter Supplementary Report) (table listing data representing more than 20 such factors); see generally Department of Justice, W. Rhodes & C. Conly, Analysis of Federal Sentencing (May 1981). The majority does not deny that judges have exercised, and, constitutionally speaking, *may* exercise sentencing discretion in this way.

Nonetheless, it is important for present purposes to understand why *judges*, rather than *juries*, traditionally have determined the presence or absence of such sentence-affecting facts in any given case. And it is important to realize that the reason is not a theoretical one, but a practical one. It does not reflect (JUSTICE SCALIA's opinion to the contrary notwithstanding) an ideal of procedural "fairness," *ante*, at 498 (concurring opinion), but rather an administrative need

for procedural *compromise.* There are, to put it simply, far too many potentially relevant sentencing factors to permit submission of all (or even many) of them to a jury. As the Sentencing Guidelines state the matter,

> "[a] bank robber with (or without) a gun, which the robber kept hidden (or brandished), might have frightened (or merely warned), injured seriously (or less seriously), tied up (or simply pushed) a guard, a teller or a customer, at night (or at noon), for a bad (or arguably less bad) motive, in an effort to obtain money for other crimes (or for other purposes), in the company of a few (or many) other robbers, for the first (or fourth) time that day, while sober (or under the influence of drugs or alcohol), and so forth." Sentencing Guidelines, Part A, at 1.2.

The Guidelines note that "a sentencing system tailored to fit every conceivable wrinkle of each case can become unworkable and seriously compromise the certainty of punishment and its deterrent effect." *Ibid.* To ask a jury to consider all, or many, such matters would do the same.

At the same time, to require jury consideration of all such factors—say, during trial where the issue is guilt or innocence—could easily place the defendant in the awkward (and conceivably unfair) position of having to deny he committed the crime yet offer proof about how he committed it, *e. g.,* "I did not sell drugs, but I sold no more than 500 grams." And while special postverdict sentencing juries could cure this problem, they have seemed (but for capital cases) not worth their administrative costs. Hence, before the Guidelines, federal sentencing judges typically would obtain relevant factual sentencing information from probation officers' presentence reports, while permitting a convicted offender to challenge the information's accuracy at a hearing before the judge without benefit of trial-type evidentiary rules. See *Williams* v. *New York,* 337 U. S. 241,

249–251 (1949) (describing the modern "practice of individualizing punishments" under which judges often consider otherwise inadmissible information gleaned from probation reports); see also Kadish, Legal Norm and Discretion in the Police and Sentencing Processes, 75 Harv. L. Rev. 904, 915–917 (1962).

It is also important to understand how a judge traditionally determined which factors should be taken into account for sentencing purposes. In principle, the number of potentially relevant behavioral characteristics is endless. A judge might ask, for example, whether an unlawfully possessed knife was "a switchblade, drawn or concealed, opened or closed, large or small, used in connection with a car theft (where victim confrontation is rare), a burglary (where confrontation is unintended) or a robbery (where confrontation is intentional)." United States Sentencing Commission, Preliminary Observations of the Commission on Commissioner Robinson's Dissent 3, n. 3 (May 1, 1987). Again, the method reflects practical, rather than theoretical, considerations. Prior to the Sentencing Guidelines, federal law left the individual sentencing judge free to determine which factors were relevant. That freedom meant that each judge, in an effort to tailor punishment to the individual offense and offender, was guided primarily by experience, relevance, and a sense of proportional fairness. Cf. Supplementary Report 16–17 (noting that the goal of the Sentencing Guidelines was to create greater sentencing uniformity among judges, but in doing so the Guidelines themselves had to rely primarily upon empirical studies that showed which factors had proved important to federal judges in the past).

Finally, it is important to understand how a legislature decides which factual circumstances among all those potentially related to generally harmful behavior it should transform into elements of a statutorily defined crime (where they would become relevant to the guilt or innocence of an accused), and which factual circumstances it should leave to

the sentencing process (where, as sentencing factors, they would help to determine the sentence imposed upon one who has been found guilty). Again, theory does not provide an answer. Legislatures, in defining crimes in terms of elements, have looked for guidance to common-law tradition, to history, and to current social need. And, traditionally, the Court has left legislatures considerable freedom to make the element determination. See *Almendarez-Torres* v. *United States*, 523 U. S. 224, 228 (1998); *McMillan* v. *Pennsylvania*, 477 U. S. 79, 85 (1986).

By placing today's constitutional question in a broader context, this brief survey may help to clarify the nature of today's decision. It also may explain why, in respect to sentencing systems, proportionality, uniformity, and administrability are all aspects of that basic "fairness" that the Constitution demands. And it suggests my basic problem with the Court's rule: A sentencing system in which judges have discretion to find sentencing-related factors is a workable system and one that has long been thought consistent with the Constitution; why, then, would the Constitution treat sentencing *statutes* any differently?

## II

As JUSTICE THOMAS suggests, until fairly recent times many legislatures rarely focused upon sentencing factors. Rather, it appears they simply identified typical forms of antisocial conduct, defined basic "crimes," and attached a broad sentencing range to each definition—leaving judges free to decide how to sentence within those ranges in light of such factors as they found relevant. *Ante*, at 510–512, 518 (concurring opinion). But the Constitution does not freeze 19th-century sentencing practices into permanent law. And dissatisfaction with the traditional sentencing system (reflecting its tendency to treat similar cases differently) has led modern legislatures to write new laws that refer specifically to sentencing factors. See Supplementary Report 1

(explaining that "a growing recognition of the need to bring greater rationality and consistency to penal statutes and to sentences imposed under those statutes" led to reform efforts such as the Federal Sentencing Guidelines).

Legislatures have tended to address the problem of too much judicial sentencing discretion in two ways. First, legislatures sometimes have created sentencing commissions armed with delegated authority to make more uniform judicial exercise of that discretion. Congress, for example, has created a federal Sentencing Commission, giving it the power to create Guidelines that (within the sentencing range set by individual statutes) reflect the host of factors that might be used to determine the actual sentence imposed for each individual crime. See 28 U. S. C. § 994(a); see also United States Sentencing Commission, Guidelines Manual (Nov. 1999). Federal judges must apply those Guidelines in typical cases (those that lie in the "heartland" of the crime as the statute defines it) while retaining freedom to depart in atypical cases. *Id.*, ch. 1, pt. A, 4(b).

Second, legislatures sometimes have directly limited the use (by judges or by a commission) of particular factors in sentencing, either by specifying statutorily how a particular factor will affect the sentence imposed or by specifying how a commission should use a particular factor when writing a guideline. Such a statute might state explicitly, for example, that a particular factor, say, use of a weapon, recidivism, injury to a victim, or bad motive, "shall" increase, or "may" increase, a particular sentence in a particular way. See, *e. g., McMillan, supra,* at 83 (Pennsylvania statute expressly treated "visible possession of a firearm" as a sentencing consideration that subjected a defendant to a mandatory 5-year term of imprisonment).

The issue the Court decides today involves this second kind of legislation. The Court holds that a legislature cannot enact such legislation (where an increase in the maximum is involved) unless the factor at issue has been charged,

tried to a jury, and found to exist beyond a reasonable doubt. My question in respect to this holding is, simply, "*why* would the Constitution contain such a requirement"?

### III

In light of the sentencing background described in Parts I and II, I do not see how the majority can find in the Constitution a requirement that "any fact" (other than recidivism) that increases the maximum penalty for a crime "must be submitted to a jury." *Ante*, at 490. As JUSTICE O'CONNOR demonstrates, this Court has previously failed to view the Constitution as embodying any such principle, while sometimes finding to the contrary. See *Almendarez-Torres, supra*, at 239–247; *McMillan, supra*, at 84–91. The majority raises no objection to traditional pre-Guidelines sentencing procedures under which judges, not juries, made the factual findings that would lead to an increase in an individual offender's sentence. How does a legislative determination differ in any significant way? For example, if a judge may on his or her own decide that victim injury or bad motive should increase a bank robber's sentence from 5 years to 10, why does it matter that a legislature instead enacts a statute that increases a bank robber's sentence from 5 years to 10 based on this same judicial finding?

With the possible exception of the last line of JUSTICE SCALIA's concurring opinion, the majority also makes no constitutional objection to a legislative delegation to a commission of the authority to create guidelines that determine how a judge is to exercise sentencing discretion. See also *ante*, at 523, n. 11 (THOMAS, J., concurring) (reserving the question). But if the Constitution permits Guidelines, why does it not permit Congress similarly to guide the exercise of a judge's sentencing discretion? That is, if the Constitution permits a delegatee (the commission) to exercise sentencing-related rulemaking power, how can it deny the

delegator (the legislature) what is, in effect, the same rule-making power?

The majority appears to offer two responses. First, it argues for a limiting principle that would prevent a legislature with broad authority from transforming (jury-determined) facts that constitute elements of a crime into (judge-determined) sentencing factors, thereby removing procedural protections that the Constitution would otherwise require. See *ante*, at 486 ("[C]onstitutional limits" prevent States from "defin[ing] away facts necessary to constitute a criminal offense"). The majority's cure, however, is not aimed at the disease.

The same "transformational" problem exists under traditional sentencing law, where legislation, silent as to sentencing factors, grants the judge virtually unchecked discretion to sentence within a broad range. Under such a system, judges or prosecutors can similarly "transform" crimes, punishing an offender convicted of one crime as if he had committed another. A prosecutor, for example, might charge an offender with five counts of embezzlement (each subject to a 10-year maximum penalty), while asking the judge to impose maximum and consecutive sentences because the embezzler murdered his employer. And, as part of the traditional sentencing discretion that the majority concedes judges retain, the judge, not a jury, would determine the last-mentioned relevant fact, *i. e.*, that the murder actually occurred.

This egregious example shows the problem's complexity. The source of the problem lies not in a legislature's power to enact sentencing factors, but in the traditional legislative power to select elements defining a crime, the traditional legislative power to set broad sentencing ranges, and the traditional judicial power to choose a sentence within that range on the basis of relevant offender conduct. Conversely, the solution to the problem lies, not in prohibiting legislatures from enacting sentencing factors, but in sentencing rules that determine punishments on the basis of properly defined

relevant conduct, with sensitivity to the need for procedural protections where sentencing factors are determined by a judge (for example, use of a "reasonable doubt" standard), and invocation of the Due Process Clause where the history of the crime at issue, together with the nature of the facts to be proved, reveals unusual and serious procedural unfairness. Cf. *McMillan*, 477 U. S., at 88 (upholding statute in part because it "gives no impression of having been tailored to permit the [sentencing factor] to be a tail which wags the dog of the substantive offense").

Second, the majority, in support of its constitutional rule, emphasizes the concept of a statutory "maximum." The Court points out that a sentencing judge (or a commission) traditionally has determined, and now still determines, sentences *within* a legislated range capped by a maximum (a range that the legislature itself sets). See *ante*, at 481–482. I concede the truth of the majority's statement, but I do not understand its relevance.

From a defendant's perspective, the legislature's decision to cap the possible range of punishment at a statutorily prescribed "maximum" would affect the actual sentence imposed no differently than a sentencing commission's (or a sentencing judge's) similar determination. Indeed, as a practical matter, a legislated mandatory "minimum" is far more important to an actual defendant. A judge and a commission, after all, are legally free to select any sentence below a statute's maximum, but they are not free to subvert a statutory minimum. And, as JUSTICE THOMAS indicates, all the considerations of fairness that might support submission to a jury of a factual matter that increases a statutory maximum apply *a fortiori* to any matter that would increase a statutory minimum. See *ante*, at 521–522 (concurring opinion). To repeat, I do not understand why, when a legislature *authorizes* a judge to impose a higher penalty for bank robbery (based, say, on the court's finding that a victim was injured or the defendant's motive was bad), a new crime is born; but

where a legislature *requires* a judge to impose a higher penalty than he otherwise would (within a pre-existing statutory range) based on similar criteria, it is not. Cf. *Almendarez-Torres*, 523 U. S., at 246.

## IV

I certainly do not believe that the present sentencing system is one of "perfect equity," *ante*, at 498 (SCALIA, J., concurring), and I am willing, consequently, to assume that the majority's rule would provide a degree of increased procedural protection in respect to those particular sentencing factors currently embodied in statutes. I nonetheless believe that any such increased protection provides little practical help and comes at too high a price. For one thing, by leaving mandatory minimum sentences untouched, the majority's rule simply encourages any legislature interested in asserting control over the sentencing process to do so by creating those minimums. That result would mean significantly less procedural fairness, not more.

For another thing, this Court's case law, prior to *Jones* v. *United States*, 526 U. S. 227, 243, n. 6 (1999), led legislatures to believe that they were permitted to increase a statutory maximum sentence on the basis of a sentencing factor. See *ante*, at 529–539 (O'CONNOR, J., dissenting); see also, *e. g.*, *McMillan, supra*, at 84–91 (indicating that a legislature could impose mandatory sentences on the basis of sentencing factors, thereby suggesting it could impose more flexible statutory maximums on same basis). And legislatures may well have relied upon that belief. See, *e. g.*, 21 U. S. C. § 841(b) (1994 ed. and Supp. III) (providing penalties for, among other things, possessing a "controlled substance" with intent to distribute it, which sentences vary dramatically depending upon the amount of the drug possessed, without requiring jury determination of the amount); N. J. Stat. Ann. §§ 2C:43–6, 2C:43–7, 2C:44–1a–f, 2C:44–3 (West 1995 and Supp. 1999–2000) (setting sentencing ranges for crimes, while providing for lesser or greater punishments

depending upon judicial findings regarding certain "aggravating" or "mitigating" factors); Cal. Penal Code Ann. § 1170 (West Supp. 2000) (similar); see also Cal. Court Rule 420(b) (1996) (providing that "[c]ircumstances in aggravation and mitigation" are to be established by the sentencing judge based on "the case record, the probation officer's report, [and] other reports and statements properly received").

As JUSTICE O'CONNOR points out, the majority's rule creates serious uncertainty about the constitutionality of such statutes and about the constitutionality of the confinement of those punished under them. See *ante*, at 549–552 (dissenting opinion). The few *amicus* briefs that the Court received in this case do not discuss the impact of the Court's new rule on, for example, drug crime statutes or state criminal justice systems. This fact, I concede, may suggest that my concerns about disruption are overstated; yet it may also suggest that (despite *Jones* and given *Almendarez-Torres*) so absolute a constitutional prohibition is unexpected. Moreover, the rationale that underlies the Court's rule suggests a principle—jury determination of all sentencing-related facts—that, unless restricted, threatens the workability of every criminal justice system (if applied to judges) or threatens efforts to make those systems more uniform, hence more fair (if applied to commissions).

Finally, the Court's new rule will likely impede legislative attempts to provide authoritative guidance as to how courts should respond to the presence of traditional sentencing factors. The factor at issue here—motive—is such a factor. Whether a robber takes money to finance other crimes or to feed a starving family can matter, and long has mattered, when the length of a sentence is at issue. The State of New Jersey has determined that one motive—racial hatred—is particularly bad and ought to make a difference in respect to punishment for a crime. That determination is reasonable. The procedures mandated are consistent with traditional sentencing practice. Though additional proce-

dural protections might well be desirable, for the reasons JUSTICE O'CONNOR discusses and those I have discussed, I do not believe the Constitution requires them where ordinary sentencing factors are at issue. Consequently, in my view, New Jersey's statute is constitutional.

I respectfully dissent.